**UNITED STATES v. FIVE ACRES OF LAND IN SUFFOLK COUNTY, MASS. et al.**

No. 6412.

District Court, D. Massachusetts.

Aug. 2, 1944.

See also 51 F.Supp. 117.

Edmund J. Brandon, U. S. Atty., and Philip P. A. O'Connell, Sp. Asst. to U. S. Atty., both of Boston, Mass., for the United States.

Robert T. Bushnell, of Boston, Mass., for Attorney General.

Joseph Israelite, City Sol. and Louis R. Bennett, Asst. City Sol., both of Chelsea, Mass., for City of Chelsea, Mass.

Goodwin, Proctor & Hoar, of Boston, Mass., for Richard T. Green Co. and M. Thomas Green, Trustee First Natl. Bank of Boston.

HEALEY, District Judge.

This matter arises from the taking by the Acting Secretary of the Navy of certain parcels of land in Chelsea, Massachusetts, for use as a marine railway.

The parties involved in this particular proceeding are Richard T. Green Company and M. Thomas Green, Trustee, owners of the land in question at different times, and the City of Chelsea, which claims that it is entitled to unpaid taxes and interest for the years 1933 to 1942. The City claims that these taxes constituted a lien on the land taken.

For the sake of convenience, the City of Chelsea will hereafter be referred to as the City, and Richard T. Green Company and M. Thomas Green, Trustee, will be referred to as the Owners.

By agreement of counsel, the issues involved were set forth by a petition filed by the City and an answer filed by the Owners.

By their answer, the Owners set up substantially the following contentions:

1) The taxes were not properly certified in accordance with Massachusetts Law;

2) The marine railway cradle and hoisting apparatus were illegally assessed as real estate, while, in fact, they are personalty;

3) Land belonging to others was illegally assessed to the Owners;

4) The Owners should not be charged with interest beyond the time of the taking; namely, January 22, 1942.

5) The taxes for 1942 should be apportioned as of the time of the taking.

The Owners' first contention has been disposed of by this Court in a memorandum filed on July 30, 1943, reported in 51 F.Supp. 117. The Owners have waived their fifth contention that the taxes for 1942 should be apportioned.

The City, by amended Reply, pleaded estoppel and the Statute of Limitations.

The assessors of the City separately assessed as Parcels 1, 2 and 3, the three parcels of land involved, on one of which (Parcel 1) is a marine railway.

The marine railway consists of a foundation, a track structure, a cradle, and hoisting machinery. The foundation upon which the track rests is constructed of wood and rests on piling which was driven and cut for the required slope. The cradle itself is three hundred and forty feet long, and, including the stone ballast, weighs approximately one thousand tons. It could safely carry 3,600 tons. The hoisting machinery, contained in a building, and consisting of a winch and steam engine, is set on bolts and secured by nuts. The bolts range in length from 5 to 8 feet, and are buried in concrete. The marine railway contains all the essentials of a drydock. It was constructed pursuant to a license dated May 28, 1919, issued by the Division of Waterways of the Department of Public Works of the Commonwealth of Massachusetts, and extends to the Massachusetts Harbor Line, a considerable distance beyond the so-called Boschke Line of 1861,

which is the extreme low water mark. The cradle travels up and down the inclined railway. The upper end of the railway is above water, and the lower end is in considerable depth of water, so that when the cradle is all the way down a ship can be floated onto it, and then the cradle can be pulled up the incline, bringing the ship with it. When the cradle is all the way down, it is, in part, outside the Boschke Line. The incline of the marine railway is at a grade of one to sixteen, this incline having been found adaptable for the particular location. The cradle is not attached to the understructure in any way, but just rests on it. The cradle operates on a series of free rollers on a flat metal track, and the power for pulling it is a system of four endless chains attached to the cradle and passing over sprockets on a big geared winch and around sheaves. The weight of the foundation and the hoisting machinery is approximately 160 to 170 tons. The machinery could be removed by unfastening the nuts and lifting the machinery off the concrete foundation. The cradle could be removed from the particluar location to another location either by removing its ballast or by the use of lighters to make it float. However, if it were removed to a new location, a new railway and foundation would have to be built in order to accommodate this particular cradle. The cradle was constructed on the premises. The marine railway could not function without the cradle or without the tracks or without the chains and rollers or without the machinery. It requires the unity of the entire structure and all its component parts for operation as a marine railway.

It is provided by General Laws of Massachusetts (Ter.Ed.) c. 59, § 3, that "real estate for the purpose of taxation shall include all land within the commonwealth and all buildings and other things erected thereon or affixed thereto."

An exhaustive search has failed to disclose any Massachusetts case which would be of much, if any, aid in determining whether or not the cradle and machinery here involved constitute real estate within the meaning of the Massachusetts statute. In fact, I have been unable to find any helpful authority anywhere. This case, therefore, presents an entirely new question.

That the foundations for the track and machinery, the track itself and the bolts are real estate has not been, and could not seriously be, questioned. The Owners make no claim that the boilers which supply the steam for operating the marine railway should not be assessed as part of the real estate. The cradle and machinery were constructed, erected and installed on the land for the purpose of operating, as a marine railway together with other integral parts which are unquestionably real estate. As stated above, all of the component parts of the marine railway operate as a unit. If the cradle were moved, a new foundation and track would have to be built to conform with the dimensions of the cradle. If the machinery were moved, it could be used again only in connection with a marine railway. The cradle, the machinery, the foundation and the track, being attached to each other (even the cradle is attached by means of the chains) and built to operate in conjunction with each other for a single purpose, should be considered as an entity. This is particularly true when considered with the degree of physical attachment and affixation and the weight of the cradle and machinery.

It is my opinion that the cradle and hoisting machinery were properly assessed as real estate.

In my opinion, Hamilton Mfg. Co. v. Lowell, 185 Mass. 114, 69 N.E. 1080, relied on by the Owners, is not in point. It was there held that mill machinery could not be taxed as real estate, but only as personal property. Of course, mill machinery may be removed and installed in its entirety in another location. There is no necessity that a new part be built to conform with dimensions in order that the whole might operate.

The fact that the marine railway extends beyond the extreme low water mark and the fact that, when the cradle is all the way down the incline, it is partly outside the extreme low water mark, do not, in my opinion, prevent its assessment, or the assessment of any part of it, as real estate to the Owners.

The marine railway was operated as a unit. It was attached to the land owned by the Owners, and only a part of it extended beyond the extreme low water mark. So too with the cradle. In my opinion, the principle of Boston Mfg. Co. v. Inhabitants of Newton, 22 Pick., Mass., 22, is governing. It was there held that water power produced by a dam extending over the land of two towns, and used solely for mills in one of the towns, was taxable only in the town where the mill was located. McGee

v. City of Salem, 149 Mass. 238, 21 N.E. 386, is distinguishable. There it was held that a greenhouse owned by one person, and on the land of another, could not be assessed as real estate to the owner of the greenhouse.

That the area content of Parcel 1 was not improperly assessed, is obvious. It was assessed as 93,538 square feet. It actually contained to extreme low water mark, between 107,800 square feet and 110,977 square feet. That the low water mark is the outer limit of ownership is clear from The Colony Ordinance of 1641—47 and from Wonson v. Wonson, 14 Allen, Mass., 71, and Commonwealth v. Alger, 7 Cush., Mass., 53. Thus, there was actually an underassessment of several thousand square feet.

The Owners next contend that no lien arose, under the law of Massachusetts, for any of the taxes assessed on Parcel No. 2. The basis of this contention is that piles and flats between the extreme low water mark and the U. S. Pierhead and Massachusetts Harbor Line of 1890, alleged to be land of the Commonwealth of Massachusetts, was illegally assessed to the Owners.

In 1846, the Massachusetts Legislature passed the following Act:

"An Act to authorize the extension of the wharves and landing places at Chelsea of the Winnisimmet Company.

"Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:

"Sec. 1. The Winnisimmet Company are hereby authorized, for the better accommodation of the public travel on the Winnisimmet Ferry to extend their wharves and docks for the reception of the ferry boats at Chelsea, into and over the tide waters of the harbor, to a distance not exceeding sixty feet from the end of their present wharves and docks at said Chelsea, by driving additional piles in front of the same, with the right and privilege of using and occupying the flats within, or adjoining the said wharves and structures for the purposes of said ferry, provided, that nothing in this act contained shall in any wise impair or interfere with the private rights of any person or persons whatsoever." Chapter 166.

The Winnisimmet Company was a predecessor in title to the Owners.

It cannot be seriously questioned that that Act of 1846 operated as a legislative grant, and not merely as a revocable license. Bradford v. McQuesten, 182 Mass. 80, 64 N.E. 688. And it is not questioned that "no particular words of inheritance are necessary to pass a fee in an ancient public grant."

It, therefore, follows that the Owners acquired a fee in the land covered by the grant. The outer limit of the grant was what became known as the Commissioner's Line of 1849. All of the flats and piles alleged to have been illegally assessed by the City as a part of Parcel 2 lie within that line. Consequently, they were part of the real estate of the Owners and were not illegally assessed.

It is also to be noted with reference to Parcel No. 2 that there was actually an underassessment of approximately 7,000 feet.

The doctrine of res judicata or estoppel by judgment raised by the Owners will be discussed later in connection with both Parcels Nos. 2 and 3.

We now come to Parcel No. 3. The Assessors' records show an area content of 22,650 square feet. Actually Parcel No. 3 contained 21,773 square feet. Thus, there was an overassessment of 877 square feet. The Owners contend that this invalidates the liens for all of these years. With this contention, I am unable to agree. I do not agree, that, from this overassessment, it must be assumed that the Owners were assessed for land belonging to others. It seems quite clear that the variance is due to improper surveying, just as the underassessment of several thousand feet in Parcels 2 and 3 was due to inaccurate surveying. Since the description and area content of Parcel No. 3, as shown on the Assessors' records, are substantially correct, I conclude that there was a valid lien and a valid tax sale. See Bemis v. Caldwell, 143 Mass. 299, 9 N.E. 623.

We now come to what is probably the most difficult problem involved in this case. The Owners contend that certain findings of fact made by a Commissioner appointed by the Superior Court, which findings of fact were adopted by a Justice of that Court, are conclusive upon the parties to the present proceedings.

The pertinent facts on this issue are as follows:

In 1930 the Richard T. Green Company brought two actions against the City of

Chelsea in the Suffolk Superior Court, No. 228,187 and 228,188 respectively on the docket of said court, each being a complaint under General Laws, Ch. 59, § 63, the first complaint being filed by way of an appeal from the refusal by the Board of Assessors for the City of Chelsea to abate taxes on the Richard T. Green Company real estate in 1926, and the second complaint for a similar refusal to abate taxes on the same real estate assessed in 1927.

On January 27, 1930, the action was referred to Francis T. Leahy, Esq., as Commissioner to hear the parties and report the facts with such parts of the evidence as either party might request.

On May 15, 1930, after hearings were held and evidence taken, consuming 12 days, at which both sides were represented by counsel, Leahy filed his report in the Superior Court, and on July 2, 1930, Mr. Justice Dillon of that Court issued in each case his "Findings and Order" in each of which he made the following statement: "I hereby find that the facts in this case are in accordance with the findings made in the Commissioner's Report." ·

On July 28, 1930, judgment for the plaintiff for the amount found due by Commissioner Leahy in each case was entered. Execution was issued on July 29, and on August 29, 1930, was returned satisfied in full. There is no record of appeal in either case. Mr. Leahy's report at page 30 stated:

"In the absence of any Act or grant of the Legislature, complainant contends that the boundary or tidewater runs to the minus-3 line, that is, three feet below mean low water, or to the extreme low water mark (Colonial Laws 1660–1672, p. 170). If this contention is right as matter of law, the complainant has been assessed for land it does not own."

The last sentence is the only finding, if it be such, with which we are concerned, in view of the conclusions reached.

It is apparent from the· entire quotation set forth above ·that Chapter 166 of the Massachusetts Act of 1846 was not introduced in evidence before the Commissioner in the Superior Court proceeding.

It may be assumed for the purposes of this case that the last sentence of the above quotation from the Commissioner's report was a finding.

 We must, of course, resort to Massachusetts Law to determine whether or not the City is· bound by such a finding.

However, I have been unable to find any Massachusetts case deciding this ·point. Merriam v. Whittemore, 5 Gray, Mass., 316, and Jennison v. Inhabitants of West Springfield, 13 Gray, Mass., 544, relied upon by the Owners, were not cases involving taxes in subsequent years. These cases set forth the general rules applicable to res judicata and collateral estoppel by judgment.

 However, there has been, in my opinion, a tendency among courts to apply a more liberal rule with reference to cases involving taxes assessed in different years. For a good, although short discussion, see Note on "Application of Res Judicata to Questions of Law in Different Causes of Action" 55 H.L.R. 120, 122–125. Of course, where the second case arises upon the same claim or demand as that litigated in the first case, a judgment on the merits in the first case is absolutely conclusive in the second case. Tait v. Western Maryland R. Co., 289 U.S. 620, 623, 53 S.Ct. 706, 77 L. Ed. 1405. American Law Institute, Restatement of Judgments, Chapter 3. However, different rules govern when the second action is, as here, based upon a different claim or demand. Tait v. Western Maryland R. Co., supra. In the Tait case, a taxpayer sought a refund, claiming that it should have been allowed a deduction for the years 1920, 1921, 1922, of an amortized proportion of the discount on the sale of certain mortgage bonds, it having been determined by the Circuit Court of Appeals for the Fourth Circuit, Western Maryland R. Co. v. Commissioner, 33 F.2d 695 on appeal from the Board of Tax Appeals in a previous proceeding that the taxpayer was entitled to such a deduction for the years 1918 and 1919. The District Court in the second case, 53 F.2d 211, found that no facts were presented which had not been before the Board of Tax Appeals in the litigation over the 1918 and 1919 taxes and that the parties were concluded by the former decision, and rendered judgment for the taxpayer which was affirmed by the Circuit Court of Appeals, 62 F.2d 933, which found "that all the facts stipulated in the present cause were before it in the former one, * * *." The Supreme Court, having granted Certiorari, affirmed the judgment, saying in part, 289 U.S. at page 626, 53 S.Ct. at page 708, 77 L.Ed. 1405:

"The petitioner may not escape the effect of the earlier judgment as an estoppel by showing an inadvertent or erroneous concession as to the materiality, bearing or

significance of the facts, provided, as is the case here, the facts and the questions presented on those facts were before the court when it rendered its judgment."

Thus, the Supreme Court seems to distinguish a situation in which all of the facts were before the court in the prior proceedings from a situation in which they were not.

It is also to be noted that in a subsequent tax case (Blair v. Commissioner, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465) it was held that where there is a ruling by a state court intervening between the first and second case, changing the situation involved in the first case, the ruling in the Tait case is inapplicable.

■ In the instant case, it is true that the situation, as it actually existed, is unchanged. However, in the prior proceedings, a very vital fact, the legislative grant of 1846, was not before the Commissioners. It would seem that this element clearly removes the instant case from the ruling of the Tait case, and brings it within the principle of the Blair case.

It was said at page 124 of 55 H.L.R. that "the ultimate question in determining the application of res judicata must be whether the prevention of redundant litigation of an issue justifies foreclosing a showing of the truth. It can be justified only insofar as it serves in fact as a 'principle of peace.' The difficulty of determining when the principle is applicable may at times necessitate as much litigation as would be taken by a reconsideration of the merits of the question. It has been suggested that this may be minimized, at least in tax cases, by limiting its application to situations where all the controlling facts are identical, and where all were in existence at the time of the prior suit." It seems to me that its application should also be limited to situations where all of the controlling facts were before the court in the prior proceeding. Any other ruling would unjustly prevent a taxpayer from bringing to the attention of the court material facts which, for some reason, were not presented in a case involving taxes for a prior year. Most of the cited cases deal with federal income taxes, but the principle would be the same in cases involving real estate taxes.

I, therefore, conclude that the City is not concluded by the finding of the Commissioner. See generally the Note referred to above in 55 H.L.R. at pages 122–125, and cases there cited. ■

Pelham Hall Co. v. Carney, D.C., 27 F. Supp. 388, is distinguishable on the same grounds as is the Tait case.

■ The Owners' final contention is that the effect of the sale and conveyance by a recorded deed dated November 24, 1941, from Richard T. Green Company to M. Thomas Green as trustee of the M. Thomas Green Trust, of the three parcels of land in question was to terminate all liens.

General Laws of Massachusetts (Ter. Ed.) Chapter 60, Section 37, as amended, on which the Owners rely, provides in part as follows:

"Taxes assessed upon land * * * shall with all incidental charges and fees be a lien thereon from January first [April first prior to 1933, c. 254, § 53] in the year of assessment. Except as provided in section sixty-one, such lien shall terminate at the expiration of two years from October first in said year, if the estate has in the meantime been alienated and the instrument alienating the same has been recorded, otherwise it shall continue until a recorded alienation thereof; * * *."

Thus, the termination of the lien is made subject to the exception of Chapter 60, Section 61. That section, as amended, St. Mass.1933, c. 325, § 9, provides in part that "whenever a town shall have purchased or taken real estate for payment of taxes the lien of the town on such real estate for all taxes assesssed subsequently to the assessment for payment of which the estate was purchased or taken shall continue * * *."

The three parcels of land involved in the instant case were sold for unpaid 1932 taxes on September 5, 1934, and tax title deeds of the Collector of Taxes to the City were recorded on October 15, 1934.

It is my opinion that, as a result of the tax sale and purchase by the City, the lien for subsequent years' taxes was continued in effect, and was not affected by the conveyance of November 24, 1941.

■ In my opinion, the City is entitled to interest in accordance with the provisions of General Laws of Massachusetts (Ter.Ed.) Chapter 59, Section 57, as amended, up to the time of payment. See United States v. Certain Parcels of Land in Mifflin Township, D.C., 47 F.Supp. 333.

Because there is considerable doubt in my mind whether or not Rule 52 of the Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c, is applicable

(see Rule 81(a) (7)) ; see also United States
v. Harrell, 8 Cir., 133 F.2d 504, 506), I
have drawn formal findings of fact and
conclusions of law to comply with Rule
52(a), and have also ruled on requests for
findings of fact and conclusions of law filed
by the Owners.

Counsel for the City shall draw an order
in conformity with this opinion and in con-
formity with the findings of fact and con-
clusions of law filed with it.