**UNITED STATES v. HARRELL et al.**
No. 12316.

Circuit Court of Appeals, Eighth Circuit.
Feb. 3, 1943.
Rehearing Denied March 1, 1943.

John P. Hearne, Atty., Department of Justice, of Washington, D. C. (Norman M. Littell, Asst. Atty. Gen., and Vernon L. Wilkinson, Atty., Department of Justice, of Washington, D. C., on the brief), for appellant.

H. B. Stubblefield, of Little Rock, Ark. (Tom F. Digby, of North Little Rock, Ark., on the brief), for appellees.

Before STONE, SANBORN, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

On December 16, 1940, the United States brought a suit in the United States District Court for the Eastern District of Arkansas, the purpose of which was to acquire the exclusive temporary use of approximately 40,000 acres of land in Pulaski and Faulkner Counties, Arkansas, in connection with national defense. An order granting the government possession of the land upon the terms set out in the complaint was entered on the same day. The government asked exclusive use and possession of the land for the calendar year 1941, with an option to renew annually its possession of "any or all of said lands" for an additional five years, the option for renewal to be exercised on or before January 1st of the year of renewal.

On March 20, 1941, appellees, with leave of the District Court, filed an intervention in the proceedings, elaborated somewhat by an amendment filed on November 17, 1941, setting up that they owned oil, gas, and mineral leases on approximately 6,000 acres involved in the government's condemnation suit and that the exclusive use and possession of the lands granted to the government "has resulted and will result in a cancellation and destruction" of the leases of the appellees to their damage in the sum of $14,000. Before the intervention came on for trial, the government and the owners of the fee of the lands reached a settlement, and that part of the suit was dismissed. We are not advised as to the terms of this settlement by anything in the record before us. Whether it in any way affected the character or term of the use granted the government is not revealed.

In answer to the intervention, the government denied that interveners were the owners of the leases as alleged in the intervention, or that the government's acquisition of the exclusive use of the lands had resulted in the cancellation or destruction of interveners' rights under the leases, or in any damage to interveners, and denied that the leases were of any value.

Apparently both parties proceeded at the trial upon the assumption that if the leases involved were of any value, the plaintiff was entitled to recover that value by reason of the use and possession by the government of the lands covered by the leases. This is illustrated by the following colloquy which occurred between the court and counsel representing the interveners:

"Mr. Digby, Sr. Will the Court instruct the jury that whatever value there is to these leases as shown in the evidence has been destroyed by the government?

"The Court. No, I won't say that, I won't say the government has destroyed these leases, that is a question left to the jury, I will state the government has taken these leases and if they have destroyed their value you are entitled to the value.

"Mr. Digby, Sr. That is all we want.

\* \* \* \* \*

"The Court. I am going to say to the jury the Government has taken these leases and whatever you believe the market value is from all the evidence and the circumstances in this case, you are entitled to that damage.

"Mr. Digby. I think that is all we want."

Counsel for the government raised no objection to this declaration of law, apparently conceding that the government had taken the leaseholds of interveners by the temporary acquisition of the land on which the leases were held. This understanding of the parties is further shown by the court's charge to the jury. Neither party requested instructions. The court, on its own motion, after stating that the comdemnation suit brought by the government "was designed to acquire a lease for the calendar year 1941, with the option to renew for five additional years" on certain lands on part of which the interveners held oil and gas leases continued as follows: "You are told, as a matter of law, that the United States has the right to condemn and take the lands for the aforesaid uses, but it is the duty of the Government to pay those owning the lands and the owners of the leaseholds thereon the fair market value thereof, and you are called upon here to determine the fair market value of the oil and gas leases held by the interveners on the date of the taking, that is, December 16, 1940. You are further told that the burden of proof in this case is on the interveners to establish the market value of their leases by a fair preponderance of the evidence." Counsel for the

government again made no objection, nor did counsel, at the close of all the evidence, move for a directed verdict. Instead, more than ten days after the jury had returned a verdict for interveners in the sum of $8,000, the government moved for an order setting aside the verdict on the ground that it was without evidence to support it. The record does not show any action by the court upon this motion except such as may be inferred from the fact that judgment was afterwards entered in accordance with the verdict. The government then moved the court to set aside the judgment on the ground that the court had erred in failing to sustain the government's motion to set aside the verdict. This motion was overruled, and the government has appealed from the judgment in favor of interveners.

The ground for reversal assigned by the government is that the verdict and judgment below are not supported by any evidence. Interveners contend that the parties having tried the case upon the theory stated above, and the government having failed to object to the court's declaration of law or to raise the question of the sufficiency of the evidence to support the verdict in the manner and within the time provided by the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, the court's charge became the law of the case, and the question of the sufficiency of the evidence to support the verdict is not open for review on this appeal.

■ In support of its right to have the question of the sufficiency of the evidence reviewed by this court, the government relies on the federal statutes, 40 U.S.C.A. §§ 257, 258; 50 U.S.C.A. § 171, providing that in trials of condemnation suits brought by the United States, the Federal District Courts will follow the procedure of the courts of the State in which the suits are instituted, and on Rule 81(a) (7) of the Rules of Civil Procedure, expressly excluding the application of those rules in condemnation proceedings. It is true, as the government contends, that for the purposes of the trial in the district court, the proper procedure was that prevailing in the courts of Arkansas in condemnation proceedings; and also that under Arkansas practice, treating the government's motion to set aside the judgment below as a motion for a new trial, the question of the sufficiency of the evidence was properly preserved. 1 Pope's Digest

of the Statutes of Arkansas § 1536; Fitzhugh v. Norwood, 153 Ark. 412, 241 S.W. 8; Bank of Hatfield v. Clayton, 158 Ark. 119, 250 S.W. 347; Driver v. Treadway, 175 Ark. 1028, 1 S.W.2d 84; Northcross v. Miller, 184 Ark. 463, 43 S.W.2d 734. But by Rule 81(a) (7), relied on by the government, it is expressly provided that the Rules of Civil Procedure, while not applicable in the trial of condemnation proceedings, shall govern on appeals from judgments of district courts in those proceedings. If the requirement that the Rules of Civil Procedure shall govern appeals from judgments in condemnation cases is to be given effect, questions for review by federal appellate courts must be preserved in the manner prescribed by those rules. The required procedure for testing on appeal the sufficiency of the evidence is by moton for a directed verdict at the close of all the evidence. Rule 50, Rules of Civil Procedure. It has been held in a case tried under the Conformity Act, 28 U.S.C.A. § 724, that Rule 50 "does not do away with but emphasizes the necessity of a motion for a directed verdict to raise [on appeal] the legal question whether the evidence is sufficient." Baten et al. v. Kirby Lumber Corp., 5 Cir., 103 F.2d 272, 274. And see Austin-Western Road Machinery Co. v. Veal et al., 5 Cir., 115 F.2d 112, 113; F. W. Woolworth Co. et al v. Seckinger, et al., 5 Cir., 125 F.2d 97.

■ Since the government failed to move the trial court, at the close of the evidence, for a directed verdict on the ground that the evidence was insufficient to sustain a verdict for the appellees, and since the government took no other equivalent action, it is not entitled as of right to a review of the question of the sufficiency of the evidence to support the judgment. See and compare Ayers v. United States, 8 Cir., 58 F.2d 607, 608; Combs v. United States, 8 Cir., 65 F.2d 787; Emanuel v. Kansas City Title & Trust Co., 8 Cir., 127 F.2d 175, 176. It was held that, under the Conformity Act, supra, before its provisions were superseded by the Rules of Civil Procedure, appellate proceedings in a circuit court of appeals were not affected by that Act. Camp et al. v. Gress, 250 U.S. 308, 317, 318, 39 S.Ct. 478, 63 L. Ed. 997.

■ But the government contends that the question is one which this court may, and should in this case, decide under

the rule that a federal appellate court, in order to prevent a manifest miscarriage of justice, may notice an apparent error not properly raised on the record. And with this contention we feel constrained to agree in the circumstances of this case. The power of the court in the respect stated and its duty to exercise it in a proper case cannot be doubted. Brasfield v. United States, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345; New York Central R. R. Co. v. Johnson, 279 U.S. 310, 318, 49 S. Ct. 300, 73 L.Ed. 706; Wiborg v. United States, 163 U.S. 632, 658, 16 S.Ct. 1127, 1197, 41 L.Ed. 289; Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 480, 53 S.Ct. 252, 77 L.Ed. 439; Helvering v. Hormel, 8 Cir., 111 F.2d 1, affirmed 312 U.S. 552, 557, 61 S.Ct. 719, 85 L.Ed. 1037; Ayers v. United States, supra; Trapp v. Metropolitan Life Ins. Co., 8 Cir., 70 F. 2d 976, 981, certiorari denied, 293 U.S. 596, 55 S.Ct. 112, 79 L.Ed. 690; Helvering v. Rubinstein, 8 Cir., 124 F.2d 969, 972; Wayne v. New York Life Ins. Co., 8 Cir., 132 F.2d 28, decided December 14, 1942. It is true that the power is infrequently exercised, and more often in criminal, rather than in civil, cases, and in both for the protection of a proper administration of justice as much as for the interests of the parties involved. In short, the rule is invoked only in the exceptional case, and its application in any particular case may not be accepted as a departure from the general rules governing the preservation of questions for review here.

This is a civil case. But it is one in which the public interest is directly and substantially involved. The right of the interveners to fair compensation for any damage caused by the government's possession and use of the lands on which interveners hold leases must be sustained. But that right rests on proof of the amount of the damages and, in the absence of such proof, the interests of neither party to this litigation may be preserved.

 There was obvious error in the court's charge to the jury. The government did not, by the acquisition of the lease on lands for one year with the option to renew annually for a period of five years, on compliance with the terms of the option, become liable to the owners of the lands for its value. Nor did it necessarily become liable to the owners of mineral leases on the lands for the value of the leases. Conceivably the government might, by the exclusive use and possession of the lands under its lease, have destroyed the value of mineral leases on the land. But that would depend on the length of time of the government's exclusive use and occupation of the land, as well as upon the terms and conditions of the mineral leases, matters upon which the record before us is silent. It does appear that on the day before the trial of the case there was a hearing before the judge in chambers at which interveners exhibited their lease contracts. At this hearing the court found that interveners were the owners of valid leases on 3,182.96 acres lying within the area on which the government had acquired its lease and, with the approval of the court, the parties entered into a stipulation to that effect. But the stipulation went no further. The court did not find, nor did the parties agree, that the government, by its possession and exclusive use of the lands on which the leases were held, had taken or destroyed the value of those leases. We are unable to discover anything in the record to support the court's charge to the jury that the government had taken the leases in question in this suit or to excuse the failure of counsel for the government to accept this charge without objection. We conclude that the basis for the charge and the government's acceptance of it lies in something that occurred at the hearing in chambers and which was not brought into the record.

 But if we are compelled, by reason of the government's conduct at the trial, to accept interveners' contention that the government is now bound by the law as given in the court's charge to the jury, nevertheless, the burden was upon interveners, under that charge, to establish the fair value of the particular leases involved in this case. No evidence was presented to the jury from which that value could be determined. The leases were never introduced in evidence. No witness before the jury professed any knowledge of their terms and conditions. It is alleged in the intervention that interveners were required by the terms of their leases to pay definite rentals to the lessors. But there was no proof of this allegation. What this rental was, and what the conditions of the leases were, how long they ran, whether the lessees-interveners were required to drill for oil and gas on penalty of for-

feiture or, if so required, to what extent, is nowhere mentioned. The jury was left in ignorance of these matters. From the evidence it had no means of knowing whether the leases were renewable from year to year, or whether they terminated within a fixed time upon failure of lessees to continue drilling operations, or to produce oil and gas in paying quantities or upon other conditions not revealed by the evidence. The jury was left to speculation for the determination of the important question of what effect, if any, the failure of the government to renew its lease for 1942, or for any other year, would have upon the value or the existence of interveners' leases. There is nothing in the evidence to show that the leases were all upon the same terms and conditions. So far as the jury knew, they may have varied greatly in matters substantially affecting their value.

The only evidence offered the jury, which even remotely tended to establish the value of the particular leases in question in this suit was testimony that interveners had on occasion, the dates of which are not given, transferred leases among themselves in return for contributions by the transferees to the expense of continued drilling operations. According to this testimony the amounts received in transactions of this character were equivalent to a purchase price of $10 per acre. But all of these transactions were among interveners themselves, in aid of a common enterprise, and afford no substantial evidence of the real value of the leases. Witnesses for interveners testified, it is true, that oil and gas leases in general in unproven territory of the character involved here, in view of the evidence of possible future commercial production resulting from interveners' operations, were reasonably worth from $5 to $50 per acre. On the other hand, the government's witnesses testified that such leases were worthless. But the witnesses for neither party were speaking or professing to speak with knowledge of the terms and conditions of the particular leases involved in this suit.

The conflicting opinions concerning value expressed by witnesses for interveners and for the government were based largely upon results of interveners' drilling operations. The proof shows that interveners had drilled one well to a depth of less than 200 feet, at which point, on the advice of a geologist, they abandoned operations and moved to another point where they drilled to a depth of over 2,000 feet. Some gas escaped from the first well, and from the second, gas in considerable quantities was produced. Witnesses for interveners estimated the production of the second well from 500,000 to 1,500,000 cubic feet. But it is admitted that this production was not in sufficient quantities to be commercially valuable. Interveners had abandoned drilling operations temporarily on advice to move to still another location. No meter had ever been placed upon the well and the claims of the amount of production were admittedly mere estimates. The territory was entirely unproven. Drilling operations were in charge of one of the interveners, the operator of cotton gins nearby. During the ginning season drilling operations were always shut down. The scene of operations was near to the city of Little Rock, but there was no evidence of any dealing in mineral leases in or near the area involved by others than the interveners themselves.

It is conceivable, of course, that the government in this case may have taken or destroyed interveners' leases, but it is equally conceivable that its possession and use of the land may have resulted only in a postponement of interveners' operations under their leases which would not necessarily destroy their value. But with no knowledge whatever concerning the particular leases involved, and no certainty as to the duration of the government's exclusive occupation of the land, it is impossible to say which, if either, of the possibilities is true. The whole question of the value of the leases and the effect of the government's occupation upon them rested entirely in speculation. The burden being upon interveners in a case in which the public interest is involved, as it is here, the judgment of the district court cannot be permitted to stand.

The judgment appealed from is reversed, and this case is remanded to the district court for further proceedings in conformity with this opinion.