**A. B. McMAHAN COMPANY, a Minnesota Corporation, Appellee,**

v.

**AMPHENOL CORPORATION, a Delaware Corporation, Appellant.**

**No. 20015.**

United States Court of Appeals. Eighth Circuit. May 20, 1971.

Frank Claybourne, Thomas E. Rohricht, Boyd H. Ratchye, St. Paul, Minn., for appellant; Doherty, Rumble & Butler, St. Paul, Minn., of counsel.

David C. Forsberg, David J. Spencer, St. Paul, Minn., for appellee; Briggs & Morgan, St. Paul, Minn., of counsel.

Before MATTHES, Chief Judge, HEANEY, Circuit Judge, and VAN PELT, Senior District Judge.

HEANEY, Circuit Judge.

The appellant, White Way Electric Sign & Maintenance Company, a division of Amphenol Corporation, brings this appeal following an adverse jury verdict in the amount of $20,720.00. The action, based on a contract dispute, was instituted in the United States District Court for the District of Minnesota by the A. B. McMahan Company, appellee. White Way denied liability and asserted a counterclaim for damages against McMahan. Jurisdiction was based on diversity of citizenship.

Following the verdict, White Way filed, in the District Court, a motion for a new trial or, in the alternative, for amendment of the judgment. The motion was based on the insufficiency of the evidence and on the impropriety of the closing argument. After submission of briefs and oral argument, the District Court denied White Way's motion in toto.

White Way appeals from the final judgment and from the District Court's denial of its post-trial motion, urging substantially the same grounds as it did below. We affirm.

White Way is a Chicago, Illinois, manufacturer of custom-made electrical advertising signs. In the summer and fall of 1966, White Way entered into discussions with Illinois Tool Works, Inc., regarding the construction of a large advertising display sign to be located outside of ITW's home office adjacent to the heavily traveled Kennedy Expressway between O'Hare Field and Chicago. The sign was to be in the form of a fourteen-foot cube mounted on a forty-foot high pedestal. The sign was to have five display faces, including a top face visible from the air, and was to rotate on the pedestal. During the discussions, White Way suggested that one of the sign faces be used as an "attraction board" producing variable messages. ITW was impressed with the suggestion and decided it would like something special and unique for the attraction board. It gave White Way a letter of intent and a check for $10,000.00 to pursue the project further.

At this point, White Way contacted McMahan, one of its suppliers, to see if McMahan could come up with a unique concept for the sign. McMahan, located in Bloomington, Minnesota, is primarily engaged in the manufacture of components for electrical signs. After some discussions with White Way, McMahan proposed to design and install a Television Programmed Display. The concept was developed by Samuel Proctor, an electronics engineer employed by McMahan to design electronic controls.

The system, as conceived and ultimately agreed to, involved the projection of an image onto a light bank by use of a television receiver, slide screen, slide projector and appropriate electronic controls. As explained by Mr. Proctor:

"We used a slide projector to project an image on a small screen. We used a television camera to view that image and break it down into bits, and this was transmitted by underground cable to a logic symmetry that accepted these bits, and then reconstructed whatever the camera saw in a pattern of lamps that it would turn on in the sign, and in that sense it was just like a large closed circuit television set except that lamps did not have an intermediate range. They were either on or they were off. * * *"

The concept incorporated an untried memory system allowing the lamp bank to hold its message or design while a new slide was focused in the projector. Once the new slide was focused, the memory unit would erase the original image and rewrite a new one on the lamp bank in a thirtieth of a second.

After the fundamental design for this Television Programmed Display was agreed upon, White Way and McMahan exchanged a series of letters setting out the contract between the parties. In essence, the contract provided that White Way was to furnish both the sign in which the Television Programmed Display was to be installed, and the 3,841 light bulbs in the lamp bank ready to be attached to McMahan's system. McMahan agreed to design, construct and provide all components for the system. It also gave a five-year operational guarantee for the system. The contract provided that McMahan would have the system's equipment fabricated, assembled and ready for installation within one hundred days from the date of the contract. The contract price was $36,-600.00 to be paid in equal installments upon (1) the signing of the contract, (2) completion of delivery and (3) full operation of the Television Programmed Display. At about the same time, No-

vember of 1966, White Way entered into a formal contract with ITW for the overall construction of the sign.

The performance of the contract is hotly disputed by the parties. The system's components were not delivered to the Chicago site until at least April 26, 1967.[1] Proctor spent from the latter part of April through the summer of 1967 constructing the Television Programmed Display and working to get consistent operation. There were admitted difficulties in achieving consistent operation. At first, the system was incapable of producing any image on the light bank. Proctor was able to overcome the major technical problems and produce an image on the light bank by June. However, the system still encountered problems which affected the consistency and resolution of the picture. Proctor continued to work on these problems during the remainder of the summer. During his entire stay in Chicago, he received substantial assistance from White Way personnel. Proctor returned to Chicago for a three-week period in September and October of 1967, during which time he worked on the system and instructed White Way in the operation and maintenance of the sign.

The crux of the dispute between the parties is the extent to which the system ever attained operational capabilities. McMahan contends that by July of 1967, or at the very latest by October, 1967, the Television Programmed Display was performing satisfactorily. White Way contends that the system never reached the point of satisfactory performance. The parties also disagree as to whether McMahan ever delivered all of the necessary components for the system.

In May, 1967, McMahan sent its invoice for the second contract payment. White Way refused to make payment. The parties discussed the matter in June, and White Way indicated that it would not be willing to pay McMahan until ITW agreed to accept the sign. Representatives of the parties again discussed payment in November of 1967. White Way took the position that the Television Programmed Display was not operating properly and that it did not intend to make any further payment. White Way also indicated that it had incurred substantial expenses in working on the system which it felt were McMahan's responsibility, and that it would bill McMahan for these expenses.[2]

Shortly thereafter, McMahan instituted this action for the $24,400 in unpaid contract installments. At trial, McMahan admitted responsibility for $3,680 of expenses incurred by White Way and thus sought an award of $20,720.

Our initial concern is to determine the issues properly before us. We first note that White Way failed to move for a directed verdict during the trial. It is clear that in the absence of an appropriate motion for directed verdict, an appellate court is powerless to review the sufficiency of the evidence to support the verdict. Wells v. Rau, 129 U.S.App.D.C. 253, 393 F.2d 362 (1968); Pennsylvania National Mutual Cas. Ins. Co. v. Nathan, 361 F.2d 18 (5th Cir. 1966); Gebhardt v. Wilson Freight Forwarding Company, 348 F.2d 129 (3rd Cir. 1965); Tsai v. Rosenthal, 297 F.2d 614 (8th Cir. 1961); Aetna Insurance Company v. Barnett Brothers, Inc., 289 F.2d 30 (8th Cir. 1961); Cox v. United States, 284 F.2d 704 (8th Cir. 1960), cert. denied, 365 U. S. 863, 81 S.Ct. 831, 5 L.Ed.2d 825 (1961); Minnehaha County, S. D. v. Kelley, 150 F.2d 356 (8th Cir. 1945); 5 Moore, Federal Practice, ¶ 50.05[1] (2nd ed. 1969).

1. The letters setting out the contract were written between November 1, 1966, and November 14, 1966. It is conceded that McMahan failed to deliver the components within one hundred days as provided for in the contract. However, McMahan contended at trial that White Way had waived its rights under this provision.

The jury was instructed on McMahan's waiver theory, and White Way makes no argument relative to this point on appeal.

2. These expenses were the subject of White Way's counterclaim. White Way's brief makes it clear that this counterclaim is not an issue on this appeal.

■■ However, to avoid resting on this procedural ground and to insure that no "manifest miscarriage of justice" has occurred,[3] we have considered the record in this case and have found sufficient evidence to send the case to the jury.[4]

The evidence regarding the operation of the sign conflicted sharply. McMahan presented one of its officers who testified that he had observed the sign in July and November, and that it was operational on both occasions. He also testified that in the course of his duties, he previously had evaluated hundreds of electrical signs; that he was familiar with the generally accepted standards of the electrical sign industry; and that in his opinion, the Television Programmed Display met these standards in both July and November. McMahan also presented the testimony of Samuel Proctor, the person responsible for the system's design, construction and operation. Proctor testified, on direct examination, that the sign was in good working order in October of 1967. On cross-examination, Proctor admitted that he didn't think the system was ready to be turned over to White Way in July of 1967, but reiterated that the sign was ready to be transferred in October. He explained that, by July, the system itself had reached an acceptable level of operation, but that it was not until his last visit to Chicago, in October, that the necessary spare logic cards and schematics were prepared or that he had instructed White Way's personnel in the theory and maintenance of the system.

McMahan also presented visual evidence in the form of slides and motion picture film of the system in operation taken by its two witnesses.

■■ While White Way presented substantial evidence indicating that the sign did not work properly, and elicited on cross-examination facts indicating that some problems with the system continued after October, we think that the evidence, as a whole, presented a jury question as to whether McMahan had completed delivery and perfected full operation of the Television Programmed Display.

In support of its position that the evidence was legally insufficient, White Way vigorously argues that the award for the entire contract price must be bottomed on a jury finding that McMahan had fully performed the contract, including its warranty provisions. We disagree.

■■ White Way's analysis disregards the jury's options under the instructions. The jury was instructed, without objection, that if White Way wrongfully refused to make payments as they came due under the contract, McMahan was entitled to be paid any installments then due and to be excused from further performance, including performance on the five-year warranty. So instructed, the jury's verdict need not indicate a finding that McMahan had fully performed the contract, or even that the jury disbelieved all of the evidence concerning the malfunctions in the system. The jury was free to view the difficulties in operating the system as evidence of warranty obligations from which McMahan had been legally excused.

Having found sufficient evidence to take the case to the jury, we summarily conclude that the trial court did not abuse its discretion in denying White Way's motion for a new trial on the grounds that the verdict was against the weight of the evidence. See generally, Tsai v. Rosenthal, *supra*; 6A Moore, Federal Practice ¶ 59.08[5] (2nd ed. 1966) (and cases cited therein).

■■ White Way's remaining contention is that the closing argument by counsel for McMahan "* * * so far transgressed the bounds of propriety

---

3. See, e. g., United States v. Harrell, 133 F.2d 504 (8th Cir. 1943).

4. In so doing, we have followed the established rule that the evidence, including all reasonable inferences to be drawn there-

from, must be viewed in the light most favorable to McMahan, the prevailing party. See e. g., Breeding v. Massey, 378 F.2d 171 (8th Cir. 1967); Hanson v. Ford Motor Co., 278 F.2d 586 (8th Cir. 1960).

that it furnishes a separate and independent ground for setting aside the perverse verdict it produced."

 Again, no objection was made at the time the argument was given. Failure to object normally precludes consideration of, or at least weakens, the merits of the claim. Curtis Publishing Company v. Butts, 351 F.2d 702 (5th Cir. 1965), aff'd, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Fabrizi v. Griffin, 162 F.Supp. 276 (W.D.Pa.), aff'd Fabrizi v. Kramer Bros. Freight Lines, Inc., 261 F.2d 594 (3rd Cir. 1958); Webster Motor Car Co. v. Packard Motor Car Co., 135 F.Supp. 4 (D.D. C.1955), rev'd on other grounds, 100 U. S.App.D.C. 161, 243 F.2d 418, cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed. 2d 38 (1957).

However, the trial court considered the contention and found the argument "* * * vigorous and hard-hitting, but not beyond the pale." We have reviewed the closing argument and cannot say that the trial court abused its discretion in denying a motion for new trial on this issue. See, *e. g.*, Rochester Civic Theatre, Inc. v. Ramsay, 368 F.2d 748, 755 (8th Cir. 1966); Tsai v. Rosenthal, *supra.*

Affirmed.