UNITED STATES of America, Appellee,

v.

Warren K. BASS; Martha G. Bass, Appellants.

John C. COLLINS and Mattie Collins

and

COMMERCIAL NATIONAL BANK OF LITTLE ROCK, ARKANSAS, Appellee.

No. 79–1526.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 11, 1980.

Decided April 15, 1980.

H. Clay Moore, Wright, Lindsey & Jennings, Little Rock, Ark., for appellants.

George W. Proctor, U. S. Atty., and Fletcher Jackson, Asst. U. S. Atty., Little Rock, Ark., for appellee, United States.

William Dean Overstreet, House, Holmes & Jewell, Little Rock, Ark., for appellee, Commercial National Bank of Little Rock.

Before HEANEY, Circuit Judge, GIBSON, Senior Circuit Judge, and STEPHENSON, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Warren K. Bass appeals a final judgment rendered on a guaranty agreement and the

District Court's [1] prior dismissal of Commercial National Bank of Little Rock, Arkansas, as a third-party defendant in a suit by the United States against Bass for the deficiency due on a Small Business Administration loan to a corporation, Immanuel Enterprises, of which Bass was secretary. Bass personally guaranteed the loan. Bass claims a reduction in the deficiency to the extent of the diminution in value of part of the collateral damaged by fire during a lapse of insurance. Bass sued the bank as a third-party defendant, alleging that the bank had a duty to obtain insurance on the collateral or a duty to notify him of the lapse of insurance. Bass also appeals the jury verdict in the District Court finding that the auction of the collateral, after foreclosure by the United States, occurred within a commercially reasonable time and in a commercially reasonable manner. Bass alleges that the jury verdict was not supported by substantial evidence. We affirm the District Court.

On April 23, 1973, the officers of Immanuel Enterprises, Inc. (Immanuel), John C. Collins, president, and Warren K. Bass, secretary, executed a note on behalf of the corporation to Commercial National Bank of Little Rock, Arkansas (Commercial), in return for a $75,000 loan. The Small Business Administration (SBA) of the federal government guaranteed the loan. The note of the corporation was also personally guaranteed by Bass and Collins and their wives. In addition, a security agreement on the collateral, farm equipment, was filed by the bank.

The terms of the note specified that the borrower was to take all necessary steps to administer, supervise, preserve and protect the collateral, including maintenance of insurance on the collateral. The note specifically provided that there was to be "no duty upon the Holder in this respect." The security agreement provided that the borrower was to take adequate care of the collateral, including the payment of insurance premiums. The security agreement also al-

lowed the bank to take discretionary action to preserve the collateral, but again specifically provided that the bank was under no duty to do so. Finally, the guaranty agreement signed by Collins and Bass provided that their obligations should not be released, discharged, or in any way affected, nor should they have any rights against the bank by reason of a deterioration or destruction of the collateral unless such deterioration was caused by the willful act or willful failure to act by the bank.

The loan was payable by Immanuel, a firm engaged in farming, in quarterly installments of principal and interest beginning June 30, 1973, through December 31, 1973, and payable semi-annually thereafter. No payments were ever made, although the June and September 1973 installments were deferred. On January 4, 1974, Collins, on behalf of Immanuel, met with an SBA official to report that the firm could not make the December 31 payment and to request another extension. The official refused to grant the extension. Within a week, Bass called the SBA and requested that the note be called due and that the collateral be taken in foreclosure. On January 30, the SBA official discussed the default with Commercial. On February 12, 1974, the SBA gave official written notice to Collins that the loan was in default. On February 28, Commercial informed the SBA that Bass had requested that the equipment collateralizing the loan be repossessed and sold in reduction of the loan. On March 25, 1974, the SBA sent notice of repossession to Collins on behalf of Immanuel. The SBA official then determined that liquidation of the collateral was necessary and on April 22, 1978, work began on the repossession.

The SBA had considerable difficulty in recovering the collateral from Immanuel. Collins could not be immediately located, and Bass did not know the exact location of the equipment. On July 15, 1974, Collins informed the SBA of the location of the equipment, whereupon the SBA found and inventoried it. On August 8, 1974, the SBA

---

1. The Honorable Richard S. Arnold, then United States District Judge for the Eastern District of Arkansas, now United States Circuit Judge, U.S. Court of Appeals, Eighth Circuit.

official wrote to Bass concerning missing items and problems with titles. In the meantime, an auctioneer, B. L. Wooley, was hired by the SBA. Wooley had twenty-nine years' experience in the auction business and had conducted over 2,500 auctions, including approximately 1,600 for the bankruptcy courts in Arkansas. On August 27, 1974, Wooley auctioned the collateral, including a cotton picker which had been damaged by fire while in Immanuel's possession. Approximately forty to fifty people attended the auction, which was advertised in a general newspaper and also publicized by 350 first-class mailings to persons thought to have a possible interest in the purchase of the foreclosed collateral. The equipment brought a total sale price of $19,325, thus leaving Bass and Collins personally liable on the remainder of the note.

On February 2, 1976, the United States sued Collins and Bass and their wives for $40,669, the remainder due on the note. Collins and Bass then filed a third-party complaint against Commercial for failing to notify them of the lapse of insurance or to insure the collateral. Commercial filed a motion for summary judgment. The District Court denied the motion on February 9, 1979, but then granted the Government's motion for partial summary judgment on the issue and dismissed Commercial as a third-party defendant on March 20, 1979. A jury verdict in favor of the Government was rendered on June 8, 1979. The jury, in special verdicts, specifically found that the auction of the equipment was conducted in a commercially reasonable manner and within a commercially reasonable time. On June 14, 1979, the District Court entered final judgment against Collins and Bass.

*Lapse of Insurance*

On appeal, Bass argues that Commercial had a duty to insure or to notify him of the

lapse of insurance on the collateral based upon, respectively, the custom and usage of the banking community in Arkansas and upon common-law principles.[2] The District Court granted partial summary judgment in favor of the Government on this issue, and dismissed Commercial as a third-party defendant.

The note, signed by Collins and Bass, specifically provided that Immanuel, Collins and Bass were "to take all necessary steps to administer, supervise, preserve, and protect the collateral; * * * there shall be no duty upon the Holder in this respect." Furthermore, the security agreement provided that the debtor would "take adequate care of collateral; insure the collateral * * preserve the collateral, and including (but not limited to) insurance premiums" and that the "Secured Party is under no duty to take any such action." The District Court found that: "Custom and usage in the banking community would be admissible only to explain otherwise ambiguous contract provisions. The * * * specific terms [of the note and security agreement] are clear and unambiguous, and custom and usage in the banking community cannot be used to vary them." We agree with the District Court and find that, taken together, no ambiguity exists in the terms of the loan documents. Parol evidence, under these circumstances, is inadmissible to vary the terms of the agreement. *Starling v. Valmac Industries, Inc.*, 589 F.2d 382, 386 (8th Cir. 1979); *Venturi, Inc. v. Adkisson*, 261 Ark. 855, 856, 552 S.W.2d 643, 644 (1977).

Bass also argues that a provision in the guaranty agreement imposes a duty upon Commercial to preserve the collateral. The provision provides:

2. We need not decide whether we must apply federal law or state substantive law independently on these issues, since we find no conflict between them. *See United States v. Yazell*, 382 U.S. 341, 356–57, 86 S.Ct. 500, 508–09, 15 L.Ed.2d 404 (1966); *United States v. Beardslee*, 562 F.2d 1016, 1020–22 (6th Cir. 1977), *cert. denied*, 439 U.S. 833, 99 S.Ct. 113, 58 L.Ed.2d 128 (1978); *cf. United States v. Conrad Pub-*lishing Co., 589 F.2d 949, 953 (8th Cir. 1978) (federal law, based on the U.C.C. as its source in commercial transactions, controls but adopts state substantive law for SBA foreclosure auction). *See generally* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 775 & n. 6 (2d ed. 1973).

The obligations of the Undersigned hereunder, and the rights of Lender in collateral, shall not be released, discharged or in any way affected, nor shall the Undersigned have any rights against the Lender * * * by reason of any deterioration, waste, or loss by fire, theft, or otherwise of any of the collateral, unless such deterioration, waste, or loss be caused by the willful act or willful failure to act of Lender.

Bass contends that Commercial's failure to obtain insurance or notify him of the lapse of the insurance on the collateral, after having received notice of its lapse, was in direct violation of this provision by constituting a willful failure to take action preserving the collateral. This provision, however, is only applicable in situations where the creditor has taken physical custody or otherwise has primary care and control of the collateral. In this case, total control was at all relevant times in the hands of Immanuel. Moreover, the specific provisions of the note and security agreement, which provide that the creditor has no duty to insure the collateral, control over the more general provisions of the guaranty agreement. *Missouri Pacific Railroad Co. v. Winburn Tile Manufacturing Co.*, 461 F.2d 984, 987 (8th Cir. 1972).

The second theory upon which Bass attempts to impose a duty upon Commercial to notify him of the lapse of insurance is based upon common-law principles. As noted above, the note and security agreement were unambiguous in providing that the creditor had no duty to insure. With regard to any duty to notify Bass of a lapse in insurance, the guaranty agreement specifically provided that Bass waived any right to notice in the manner with which the creditor dealt with the collateral.[3] *See United States v. Newton Livestock Auction Market, Inc.*, 336 F.2d 673, 677 (10th Cir. 1964). Furthermore, Collins's deposition reveals that he, the president of Immanuel, was given actual notice of the lapse by the insurance company. Commercial has no duty to inform each and every officer of a debtor corporation of the lapse of insurance on collateral.[4] This situation is ironic because Bass, as an officer of Immanuel, had an obligation to see to it that the insurance was in force and that proper arrangements were made to pay for it.

*Commercial reasonableness of the auction*

■ Bass appeals the special jury verdicts finding that the auction sale of the collateral was held (1) within a commercially reasonable time, and (2) in a commercially reasonable manner. Bass maintains that the verdicts were not supported by substantial evidence. At trial, Bass's attorney did not move for a directed verdict or for a judgment notwithstanding the verdict. Under these circumstances, we are powerless to review the sufficiency of the evidence except for plain error. *Harris v. Zurich Insurance Co.*, 527 F.2d 528, 529 (8th Cir. 1975); *A. B. McMahan Co. v. Amphenol Corp.*, 443 F.2d 1072, 1075–76 (8th Cir. 1971); *United States v. Harrel*, 133 F.2d 504, 506–07 (8th Cir. 1943). *See generally* 5A Moore's Federal Practice ¶ 50.05[1] (2d ed. 1979). The evidence presented at trial

---

**3.** The guaranty agreement provided that Bass "waives any * * * notice of * * * nonpayment [of] * * * any obligation of any party at any time comprised in the collateral."

**4.** In his argument on this issue, Bass relies heavily upon the case of *United States v. Fyles*, 253 F.Supp. 386 (D.Vt.1965), which held generally that the SBA had a duty to notify guarantors of a corporate loan when the insurance lapsed. *Fyles*, however, is distinguishable in two important ways. First, the guarantors had ceased to have any business connection with the corporation for a period of over a year before the time the insurance lapsed. Second, there is no explicit note, security agreement, or guaranty agreement referred to in *Fyles* which explicitly contracted away any common-law duty to insure or notify the guarantors of the lapse. In the present case, Bass was secretary of Immanuel, continuing in that capacity throughout the entire period. Notice of the lapse was given to Collins in behalf of Immanuel. Commercial could presume that adequate notice was given to the corporation and the personal guarantors. In addition, the agreement, signed by Immanuel, Bass, and Collins, explicitly contracted away any common-law duty on the part of Commercial. *See Commerce Union Bank v. May*, 503 S.W.2d 112, 118 (Tenn.1973).

was sufficient to support a finding of commercial reasonableness in the handling of the auction. The auction was conducted in a regular manner by an experienced auctioneer within two months of the time the SBA was first able to locate all the collateral. Any delay in assembling the equipment for auction was primarily due to the failure of Bass and Collins to promptly inform the SBA of its location. Bass did not even attend the auction. Guarantors or owners cannot expect that the highest market value or anything close to it will be received on auctioned property in foreclosure sales of this type. Under these circumstances, no plain error can be found in the jury's verdicts.

Affirmed.