Jeffrey T. LANGE, a Minor, by and through his Father and Next Friend, George T. Lange, and George T. Lange, Individually, Appellants,

v.

Richard D. SCHULTZ, S. Patrick Adley, Individually and Anesthesia Associates, P. C., a Professional Corporation, Appellees.

No. 79–1949.

United States Court of Appeals, Eighth Circuit.

Submitted May 22, 1980.

Decided July 30, 1980.

John J. Higgins, Jr., Eisenstatt, Higgins, Kinnamon & Okun, Omaha, Neb., argued, for appellants; Dennis M. Mahoney, Johnson & Mahoney, Denver, Colo., on brief.

William M. Lamson, Jr., Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., argued, for appellee, Schultz; Lyman L. Larsen, Omaha, Neb., on brief.

Lyle E. Strom, Fitzgerald, Brown, Leahly, Strom, Schorr & Barmettler, Omaha, Neb., for appellee, Adley.

Before HEANEY, Circuit Judge, GIBSON, Senior Circuit Judge, and ROSS, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Jeffrey T. Lange and his father, George T. Lange, appeal from a jury verdict rendered in this diversity case in the United States District Court for the District of Nebraska.[1] The jury found the defendants,

1. The Honorable Albert G. Schatz, United States District Judge, District of Nebraska.

Dr. Richard D. Schultz, Dr. S. Patrick Adley, and Anesthesia Associates, a corporation, not negligent in the administration of an anesthetic during an operation on Jeffrey Lange. On appeal, Jeffrey Lange, through his father George T. Lange, and George T. Lange in his individual capacity contend that the trial court erred in refusing to grant their motion to quash the jury panel, in failing to object *sua sponte* to the defendants' closing argument, and in giving its instructions to the jury. Appellants also contend the trial court erred in failing to grant their motion for a new trial. We affirm the District Court.

## I.

On July 21, 1975, eleven-year-old Jeffrey Lange was admitted to the hospital at Fort Dodge, Iowa, with various complaints including sore throat, headache, cough, fever, pain in his left chest, nausea, and stiffness of the neck. Jeffrey had a history of respiratory problems. Upon admission, a chest X-ray was taken which revealed a dense pneumonitic infiltrate in the left upper lobe of the left lung. Antibiotics were prescribed but they failed to clear up the pneumonia symptoms. On August 1, 1975, Jeffrey was admitted to St. Joseph's Hospital in Omaha, Nebraska, under the care of Dr. Joseph Campbell, Jr., a pulmonary specialist. Further chest X-rays were taken and additional tests were performed to determine the source of the pneumonia. Antibiotic treatment was continued and Jeffrey was discharged on August 14. On the same day Jeffrey's mother telephoned Dr. Campbell to inform him that her son had had a severe coughing episode and had coughed up some hair. Dr. Campbell concluded that Jeffrey may have a dermoid cyst or tertoma (a form of nonmalignant tumor) of the upper left lung and ordered him readmitted to the hospital. Dr. Campbell recommended that a thoracotomy be performed in order to remove the tumor and that Dr. Richard D. Schultz, a thoracic and cardiovascular surgeon, perform the operation. Prior to the date of the operation, August 18, 1975, Jeffrey failed to cough up any more hair or tumor contents.

On the morning of the operation, Dr. Schultz discussed with Dr. Stephen Adley, the anesthesiologist, the case history and forthcoming operating procedure. At this time the physicians decided to check Jeffrey's bronchial tubes by using a bronchoscope to attempt to determine whether the tumor or its contents had broken through or into the tubes from his lungs.

The operation began with the check of Jeffrey's bronchial tubes. Dr. Schultz found them to be apparently clear of debris. Dr. Adley then placed the endotracheal tube to afford an airway to ventilate Jeffrey's lungs. Jeffrey was placed on the operating table with his left side up. Midway into the operation, Dr. Schultz noticed a slowed heart rate, a bradycardia. After administering a drug to counteract the slow heartbeat, Dr. Adley noticed marked resistance to respiration while ventilating the patient. Dr. Adley then checked the endotracheal tube and found a lack of suction, which he diagnosed to be an obstruction beyond the endotracheal tube, perhaps in the right main stem bronchus.

Dr. Schultz immediately suspected that the contents of the tumor had spilled. He removed the endotracheal tube and inserted the bronchoscope, allowing suctioning and ventilation to begin again. The bronchoscope was used to pull out the blockage, which consisted of the tumor's filling, a cheese-like matter. Once the airway was cleared, Dr. Adley inserted a tube all the way into the right stem bronchus. The remainder of the operation was uneventful.

As a result of the temporary stoppage of the flow of oxygen to Jeffrey's brain he suffered hypoxia to the brain and suffered some neurological damage. As of the present date, Jeffrey appears to have made significant progress in overcoming his brain damage.

At trial, plaintiff presented two medical experts, Dr. Stephen Bell, an anesthesiologist, and Dr. John Burrington, a surgeon, both of whom had taught at the University of Colorado Medical Center. Both of these physicians testified that in their opinion

Drs. Schultz and Adley should have utilized a method of ventilation involving the insertion of a tube beyond the bronchial tube and into the lower right lung, a technique called one-lung intubation. This manner of ventilation would have prevented the cloggage of Jeffrey's airway passage. In fact, after the tumor spilled, Dr. Adley utilized the one-lung intubation method for the remainder of Jeffrey's operation.

The defendants, in rebuttal, presented three experts, Dr. Herbert Reese, Dr. Randolph Ferlic, and Dr. Watland,[2] who testified that the one-lung intubation method had a risk associated with its use which must be weighed against the risk of spillage involved when the ordinary endotracheal tube method is used. The physicians testified that, with the one-lung intubation method, the placement of the tube must be exact or the supply of oxygen would be significantly reduced, causing hypoxia. The physicians testified that the endotracheal tube method combined with use of the bronchoscope was consistent with the standard of care in the Omaha community, given the nature of Jeffrey's ailment.

On July 3, 1979, the jury returned a verdict for the defendants. On July 10, 1979, the plaintiffs filed a motion for a new trial which was denied by the court on October 5, 1979.

## II.

### A. *Jury selection*

Appellants (hereinafter referred to as Lange), after receiving a copy of the jury list for the June 11, 1979 panel, moved to quash the panel on the grounds that it did not contain a representative cross-section. By affidavit, Lange asserted that approximately one-sixth of the panel was in some way related to the medical or insurance profession. The trial court, after a hearing on June 11, 1979, overruled the motion. Lange alleges that during voir dire he was forced to use peremptory challenges to re-

move these individuals, thereby denying him the opportunity to use the challenges at a time of his choosing. Lange claims he was denied a fair and impartial jury.

After the trial court's ruling on the motion, the parties proceeded with selecting and impanelling the jury. Lange alleges that he utilized two peremptory challenges to remove two registered nurses from the jury. Lange, however, made no challenge of any potential juror for cause to the trial court. We find no error in the trial court's failure to grant Lange's motion to quash the jury panel.

If Lange is alleging that the selection procedure violated the statutory scheme set forth in the Jury Selection and Service Act of 1968, Pub.L.No. 90–274, 82 Stat. 54 (codified at 28 U.S.C. §§ 1861–1874 (1976)), then 28 U.S.C. § 1867 provides the exclusive procedure to be used in making the challenge. Lange must submit "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title * * *." *Id.* at § 1867(d). In his affidavit, Lange asserted that, of a total of sixty-three jurors on the panel, four jurors were nurses, two jurors were married to women in the medical field, and four jurors were employed in the insurance industry.

We note that it is somewhat unusual for a party challenging a jury panel to do so on the grounds that it overrepresents, rather than excludes, certain economic groups in the community. Nevertheless, the systematic overrepresentation of certain groups could result in discrimination against other groups who are displaced. *See Regents of the University of California v. Bakke*, 438 U.S. 265, 307, 98 S.Ct. 2733, 2757–2758, 57 L.Ed.2d 750 (1978). Lange, however, has not met his burden of demonstrating systematic overrepresentation. As we stated in *United States v. Williams*, 421 F.2d 529, 532 (8th Cir. 1970):

Appellant's burden was to show that the *selection process* was discriminatory and

---

**2.** Drs. Reese and Ferlic are thoracic and cardiovascular surgeons practicing in Nebraska. Dr. Watland is an anesthesiologist practicing in

Omaha. In addition, Dr. Ferlic is an associate professor at the University of Nebraska.

even positive proof that one particular product of that process, *i. e.*, one jury panel does not represent a cross-section of the larger popular community cannot establish a discriminatory process, unless compounded with *additional* probative proof that a more than coincidental number of previous panels were similarly constituted.

Lange did not present any factual evidence or make any factual allegations that the juror selection process was skewed in favor of medical and insurance employees. At the most, Lange's affidavit suggested that when ten jurors out of sixty-three are *in some way related* to the medical or insurance field a statistical aberration may have occurred in the selection of this particular panel.[3] Lange failed to meet his burden of demonstrating discrimination in the selection process.

█ · If Lange was concerned about the bias or prejudice of particular members of the jury, then he should have challenged these jurors for cause during voir dire. The fact that Lange instead chose to use peremptory challenges to exclude two of the prospective jurors cannot be visited as error on the part of the trial court.

## B. *Closing argument*

During the defendants' closing argument, the counsel for Dr. Adley made a reference to the fact that Lange had not called Ms. Jean Schinstock, a Denver resident who was one of the nurses in the operating room at the time of the surgery on Jeffrey. Lange alleges that at the time of trial, Schinstock ·had stated in a phone conversation that Dr. Adley was not in the operating room at the time of the airway obstruction to Jeffrey. Instead, Ms. Cindy Johnson, a student nurse-anesthetist, was alleged to be in charge of the anesthesia at that time. Johnson, however, also no longer lived in Omaha, and refused to return for the trial. Dr. Adley's counsel made the following remarks with regard to this situation:

Depositions have been read both by the plaintiffs and by the defendants in this case, and there was some allusion by Mr. Higgins during his Closing Argument to "Well, why wasn't So and So and So here?" I think he made reference to Cindy Johnson at one time, or someone else. These witnesses are outside of the jurisdiction of the court. We have no more control over them, as the defendants, than they do as the plaintiffs. * * So we're just as powerless as the plaintiff in this case to bring witnesses, and if witnesses are busy or tied up or have other commitments, because no one knows when these cases are going to trial more than usually a few days in advance, there's just no way to bring them here, and there should be no more adverse inference drawn as far as the defendants are concerned or the plaintiffs.

* * * [On the issue of] whether Dr. Adley was in that room during this operation, * * * if he weren't, they have one of the nurses in Denver, Jeanie Shinstock [sic] who was supposed to be in the room at the time. Mr. Mahoney hasn't had any difficulty in getting the physicians, the doctors, from Denver to come back here and testify. You can be sure that he has known all this time this case has been pending that Jeanie Shinstock [sic] lives in Denver, and so if her testimony would have been any different than any of the other participants in that operating room, you can be sure that they would have brought her back here to so testify. She didn't testify. And he will say, "Well, why should you draw any adverse inference there?" It's the same adverse inference they're asking you to draw because we didn't bring Cindy Johnson back for the simple reason that she lives outside the subpoena power of this court, we have no way of compelling her to testify.

Lange did not object during trial at the time the remarks were made because he knew he "could not respond to the remarks made by Dr. Adley's counsel, and did not

---

**3.** We do not imply that any such aberration occurred.

wish to draw further attention of the jury to this misstatement of the record * *." Appellant's Brief at 41. On appeal, he asserts that the trial judge should have objected, *sua sponte*, to the counsel's remarks. Lange maintains that the trial court's failure to object to the remarks permitted the jury to assume counsel's argument was not wrong. As a result Lange argues that the trial court should have granted a new trial due to the alleged incorrect statements contained in the counsel's remarks.

Lange further alleges that Schinstock had tentatively agreed to return for trial but later changed her mind. During the trial, he filed a motion to recess in order to take her deposition. The trial court denied the motion. Lange does not appeal the denial of that motion.

■ Rule 46 of the Federal Rules of Civil Procedure retains the requirement that counsel make timely objections to the court. The Supreme Court, in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239, 60 S.Ct. 811, 851, 84 L.Ed. 1129 (1940), held that counsel, during closing argument, "cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial." This court, in *Thomson v. Boles*, 123 F.2d 487, 495–96 (8th Cir. 1941), *cert. denied*, 315 U.S. 804, 62 S.Ct. 632, 86 L.Ed. 1204 (1942), adhered to the Supreme Court's ruling and held that "counsel must either make an objection or take an exception or move for a mistrial at the time of the alleged misconduct, or where it involves a closing argument, counsel may, and preferably should, make his objection, take his exception, or ask for remedial action at the close thereof and before the case is submitted to the jury."

Only in extraordinary situations, in order to prevent a "plain miscarriage of justice," will a reviewing court reverse a judgment based upon errors not objected to at trial. *Wichmann v. United Disposal, Inc.*, 553 F.2d 1104, 1106 (8th Cir. 1977).

■ As stated above, Lange admits in his brief that he made a conscious choice not to object prior to the submission of the case to the jury. Lange evidently did not believe that Dr. Adley's counsel's comments were so prejudicial and misleading that a "plain miscarriage of justice" would occur if the jury considered the case after hearing the comments. We find no plain error.

Furthermore, the closing argument of Dr. Adley's counsel was within the bounds of propriety. Lange had had an opportunity to take Ms. Schinstock's deposition but had declined to do so prior to trial. The reason for Schinstock's failure to testify at trial was within the realm of speculation. Dr. Adley's counsel posited but one possible reason for Schinstock's failure to appear, namely that since she lives outside the subpoena power of the court, counsel was not able to compel her to testify. Whether Schinstock could be deposed in Denver was irrelevant to her failure to appear at trial. The trial court did not err in failing to object, *sua sponte*, to Dr. Adley's counsel's closing argument.

C. *Instruction to the jury*

■ Lange also appeals the trial court's instructions to the jury, although he did not object to the instructions at the time of trial.[4] Federal Rule of Civil Procedure 51 states in part: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which

4. Lange did object to instructions 12, 17, and 20 on the basis that the standard of care should relate not only to the Omaha community but also "similar communities." The court sustained that objection and modified the instructions. Lange also objected to instruction 14's inclusion of the phrase, "the doctor is not a guarantor of a good result." The court properly overruled this objection. *See Kortus v. Jen-* sen, 195 Neb. 261, 268, 237 N.W.2d 845, 850 (1976), *quoting Robbins v. Nathan*, 189 App. Div. 827, 179 N.Y.S. 281 (1919); *cf. Greenberg v. Bishop Clarkson Memorial Hosp.*, 201 Neb. 215, 220–221, 266 N.W.2d 902, 907 (1978) (distinguishing *Kortus* on other grounds). None of these specific objections has been assigned as error on appeal.

he objects and the grounds of his objection." The purpose of Rule 51 is to compel litigants to afford the trial court an opportunity to correct a defective instruction and also to prevent the losing party from obtaining a new trial through relying on a possible error in the original trial. *E. g., Missouri Pacific Railroad Co. v. Star City Gravel Co.*, 592 F.2d 455, 459 (8th Cir. 1979); *Luster v. Retail Credit Co.*, 575 F.2d 609, 618 (8th Cir. 1978). Any plain error exception to Rule 51's preclusion of appellate review of instructions on the basis of objections not specifically stated at trial "should be confined to the exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Figge Auto Co. v. Taylor*, 325 F.2d 899, 907 (8th Cir. 1964); *see Luster v. Retail Credit Co., supra*, 575 F.2d at 618.

 Lange complains that the instructions as a whole were confusing, misleading, and unduly weighted in favor of the defendant physicians. In addition, Lange alleges that the instructions did not properly inform the jury of what duties were owed to the patient. These allegations of error are general in nature and are of the type which Rule 51 was promulgated to deal with. Our review of the trial court's instructions reveals that, on the whole, the court properly instructed the jury on the duty of care owed the patient. The instructions were not in plain error.

### III.

 Finally, Lange contends that a new trial should be granted since he claims that the jury verdict was contrary to the evidence and clearly against the weight of the credible evidence. At trial, however, Lange did not move for a directed verdict or for judgment notwithstanding the verdict. Lange did file a post-trial motion for a new trial on the grounds of insufficiency of the evidence. This motion was denied by the trial court on October 5, 1979. Ordinarily, a failure to move for a directed verdict or a judgment notwithstanding the verdict during trial precludes appellate review of the sufficiency of the evidence except for plain error. *See United States v. Bass*, 618 F.2d 500, 503 (8th Cir. 1980); *Harris v. Zurich Insurance Co.*, 527 F.2d 528, 529 (8th Cir. 1975). However, Lange filed a notice of appeal from the denial of his post-trial motion for a new trial and designated the insufficiency of the evidence as an issue on appeal. Lange thereby presented the issue of "whether the district court abused its discretion in denying the motion for new trial on the grounds of insufficient evidence.[1]" *Id.* at 529–30.[5] *See also Hannah v. Haskins*, 612 F.2d 373, 376 (8th Cir. 1980). We find neither an abuse of discretion by the trial court in denying the new trial motion nor plain error in the jury's verdict.

Lange's version of the evidence maintains that an opening or communication existed between the left lung and bronchial tubes at the time of surgery and that the defendant physicians were put on notice of the opening by the fact that Jeffrey had coughed up hair a few days earlier. Furthermore, Lange contends that the use of a bronchoscope to check for the existence of the opening could not be relied upon to give a definite answer. Lange claims that this reliance on the bronchoscope led the physicians "to forego precautionary measures which Dr. Adley testified should have been used if an active communication existed." Appellant's Brief at 29. Lange asserts that the explanation given at trial by the defendants' physicians concerning the weighing of the risks of one-lung intubation against the ordinary endotracheal method was no more than "an attempt to explain away the failure to implement measures to protect against spillage * * *." *Id.*

5. In *Harris v. Zurich Insurance*, 527 F.2d 528, footnote 1 reads as follows:

 We are not technically reviewing the sufficiency of the evidence. Rather, we are reviewing whether the district judge has abused his judicial discretion in denying a new trial or whether as a matter of law the denial of a new trial was erroneous because there was an "absolute absence of evidence to support the jury's verdict." (Citation omitted.) *Urti v. Transport Commercial Corp.*, 479 F.2d 766, 769 (5th Cir. 1973).

The jury, however, could have taken a different view of the facts at issue in the trial. The opening could have closed between the time Jeffrey coughed up the hair and the date of his surgery. During this period, all of the phlegm Jeffrey coughed up was collected and examined. No further foreign material was found. The evidence also suggests that the physicians were aware of the possibility that an opening existed. A bronchoscope examination was conducted immediately prior to the surgery. The examination failed to reveal an opening or any foreign matter in the bronchial tubes.

Furthermore, the evidence presented to the jury supported the conclusion that the one-lung intubation method proposed by Lange's experts could have significant risks in its use, especially when an eleven-year-old child was involved. While the probability of oxygen starvation was perhaps slight, especially if an enriched oxygen mixture were used, the event if it occurred could have disastrous effects. *Cf. United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947). Even Lange's expert, Dr. Bell, testified on cross-examination that he knew of a case of paraplegia which he believed resulted from the one-lung intubation method. In any event, the evidence presented was conflicting and the jury is the final arbiter of the facts, not the courts. Here Lange was unable to persuade the jury, in this controversy of contrasting medical procedures, that his theory of the proper medical procedure to be used was the only correct one under the conditions and circumstances then presented.

The jury's verdict was not plain error. Nor was the trial court's denial of Lange's post-trial motion an abuse of discretion. The jury weighed the testimony concerning the one-lung intubation method with regard to its advantages in the event of spillage and its disadvantages with regard to the possibility of oxygen starvation. There is sufficient evidence to support the jury's verdict.