# United States Court of Appeals
### For the Eighth Circuit

_____

No. 12-3239

_____

Bank of America, N.A.,

*Plaintiff - Appellant*,

v.

JB Hanna, LLC; Kerzen Properties, LLC; Burt Hanna; Hanna's Candle Company,

*Defendants - Appellees.*

_____

No. 12-3352

_____

Bank of America, N.A.,

*Plaintiff - Appellee*,

v.

JB Hanna, LLC; Kerzen Properties, LLC; Burt Hanna; Hanna's Candle Company,

*Defendants - Appellants.*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: February 11, 2014
Filed: September 8, 2014

_____

Before LOKEN, BYE, and COLLOTON, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Burt Hanna, JB Hanna, LLC ("JB Hanna"), Kerzen Properties, LLC ("Kerzen"), and Hanna's Candle Company, LLC ("Hanna's Candle") (collectively, "the Hanna Parties") borrowed several million dollars, in the form of floating-interest-rate loans, from Bank of America, N.A. ("the Bank"). The Hanna Parties failed to pay the balance due on one of the loans when it matured. The Bank sued the Hanna Parties for breach of contract. The Hanna Parties counterclaimed, alleging fraud, breach of fiduciary duty, negligence, deceptive trade practices, and breach of contract by the Bank, and demanding reformation or rescission.

The district court granted summary judgment in favor of the Bank as to the Hanna Parties' counterclaims. The Bank's claims proceeded to trial, and a jury concluded that the Hanna Parties did not breach the contract. The district court denied the Bank's post-verdict motions for judgment as a matter of law and for a new trial. The Bank appeals, and the Hanna Parties cross-appeal. We conclude that the case was properly submitted to a jury, and the Bank is precluded by the rules of procedure from seeking a judgment as a matter of law, but that the jury's verdict was against the great weight of the evidence, so we reverse and remand for a new trial on the Bank's breach-of-contract claims. We agree with the district court that the Hanna Parties' counterclaims fail as a matter of law, and we therefore affirm the court's grant of summary judgment for the Bank as to those claims.

I.

Burt Hanna is a businessman from Arkansas. Hanna owns and manages JB Hanna, Kerzen, and Hanna's Candle, all of which are Arkansas limited liability companies. The Bank is a national banking association with its main offices located in North Carolina.

In 1998 and 1999, JB Hanna borrowed $6.5 million at a floating interest rate from the Bank's predecessor-in-interest, NationsBank, N.A.; the loan matured in 2010. To fix artificially the loan's interest rate, in 1998 JB Hanna and NationsBank entered into an interest rate swap, on a notional principal amount of $6.5 million, terminating in 2010. The 1998 swap, and all of the later swaps between JB Hanna and the Bank, were governed by an International Swap Dealers Association ("ISDA") Master Agreement dated September 10, 1998.

An interest rate swap allows a borrower to hedge his exposure to changes in the interest rate on a floating-rate loan. In the simplest case, the borrower makes fixed-rate interest payments to a counterparty, who in turn makes floating-rate interest payments to the borrower. Both payment streams are based on a notional principal amount that often decreases during the term of the swap and matches the declining balance of a corresponding loan. By paying a fixed rate of interest to a counterparty in exchange for the counterparty making payments based on the floating rate, a borrower can artificially "fix" the rate of interest he must pay on any associated loan.

In May 2001, JB Hanna borrowed $4.2 million at a floating interest rate from the Bank; the loan matured in 2010. JB Hanna and the Bank also entered into an interest rate swap, on a notional principal amount of $4.2 million, terminating in 2008.

In October 2001, JB Hanna borrowed another $2.4 million at a floating interest rate from the Bank; the loan matured in 2005. The loan was secured by a mortgage

on JB Hanna's real property, an assignment of rents, and an interest in JB Hanna's personal property. Mr. Hanna personally guaranteed the loan. JB Hanna and the Bank also entered into an interest rate swap, on a notional principal amount of $2.4 million, terminating in 2005. In 2007, the October 2001 JB Hanna loan was extended for five years, with a new maturity date in 2012. JB Hanna and the Bank also entered into a corresponding interest rate swap.

In 2005, JB Hanna sought to borrow an additional $4 million from the Bank, to fund a divorce settlement of Mr. Hanna's. Initially, JB Hanna and the Bank discussed entering into a five-year, $4 million loan and an interest rate swap on a notional principal amount of $4 million. At the time, however, JB Hanna still owed the Bank approximately $7.2 million on the 1998-99 and May 2001 loans, so the parties discussed the possibility that the Bank would refinance JB Hanna's existing indebtedness in conjunction with the proposed $4 million loan, thus executing one new $11.2 million loan agreement.

On June 29, 2005, several Bank employees discussed an alternative proposal, namely, that all of JB Hanna's existing swaps be terminated, too, such that the parties would execute one new $11.2 million loan *and* one new $11.2 million swap. The Hanna Parties assert that if JB Hanna agreed to the restructured swap, the Bank would make more money, and the Bank's individual employees stood to improve their quarterly performance. The Bank allegedly recommended this revised structure to JB Hanna, representing that it would allow JB Hanna to pay a lower effective rate of interest. According to the Hanna Parties, the representation that the revised structure was a better deal for JB Hanna was false because, in reality, that structure was projected to result in JB Hanna's paying more interest overall.

On June 29, 2005, JB Hanna and the Bank entered into an interest rate swap, on a notional principal amount of $11.2 million, that on its face terminates on August 1, 2015. In September 2005, JB Hanna and the Bank entered into a floating rate loan

of $11.2 million with a stated maturity date of September 20, 2010. The 2005 JB Hanna loan was secured by a mortgage on JB Hanna's real property, an assignment of rents, and an interest in JB Hanna's personal property. Mr. Hanna personally guaranteed the loan.

According to Mr. Hanna, although JB Hanna's attorneys reviewed the 2005 JB Hanna loan documents, JB Hanna was not represented by counsel with respect to the 2005 JB Hanna swap, and JB Hanna relied on the Bank to recommend an appropriate transaction. Notwithstanding the plain terms of the agreements, the Hanna Parties allegedly did not realize that the 2005 JB Hanna loan was actually a five-year agreement, with a term that did not match the ten-year term of the 2005 JB Hanna swap. Mr. Hanna alleges that he first learned in May 2008 that the 2005 JB Hanna swap extended until 2015, whereas the 2005 JB Hanna loan matured in 2010. In October 2008, he also became aware that unless JB Hanna could pay the amount due or refinance the loan upon its maturity in 2010, the Bank could accelerate all of JB Hanna's obligations under the 2005 swap agreement.

In 2006, Kerzen borrowed $2.4 million at a floating interest rate from the Bank; the loan matures in 2015. The 2006 Kerzen loan agreement mandated that Hanna's Candle comply with several financial-condition covenants—namely, maintenance of a certain debt service coverage ratio, tangible net worth, and fixed charge coverage ratio—breach of which would constitute default by Kerzen. The loan was secured by a mortgage on Kerzen's real property, an assignment of rents, and an interest in Kerzen's personal property. Hanna's Candle guaranteed the loan. Kerzen and the Bank also entered into an interest rate swap, on a notional principal amount of $2.4 million, terminating in 2015. The 2006 swap was governed by the "2002 ISDA Master Agreement," entered into by Kerzen and the Bank on December 6, 2005.[1]

---

[1]Due to a change in name for the ISDA, the 2002 Master Agreement refers to the organization as the International Swaps and Derivatives Association.

-5-

In the various swaps, guaranties, security agreements, the 1998-99 and May 2001 JB Hanna loans, and the 2006 Kerzen loan, the parties agreed to waive a jury trial in the event of a dispute arising from those transactions. The October 2001 and 2005 JB Hanna loans, however, did not contain a jury-trial waiver.

In September 2010, according to the express terms of the 2005 loan agreement, the 2005 JB Hanna loan matured. JB Hanna failed to pay the balloon payment due. Consequently, on October 13, 2010, the Bank declared JB Hanna in default on the 2005 loan. The Bank also notified the Hanna Parties that, pursuant to the cross-default provisions in the other agreements, the Bank had accelerated all of JB Hanna's and Kerzen's outstanding obligations, rendering their debts to the Bank immediately due and payable. The Bank demanded that the Hanna Parties pay those debts before October 18, 2010. The Hanna Parties did not pay the full sum demanded by that date.

Separately, in March 2010 and again in February 2012, the Bank notified Kerzen that Hanna's Candle had failed to comply with the financial-condition covenants of the 2006 Kerzen loan, and that Kerzen was therefore in breach of that agreement. According to the Bank, Hanna's Candle failed to meet some of these covenants in 2007, and in 2009, Hanna's Candle's tangible net worth again fell below the required level. The Bank's March 2010 and February 2012 letters further informed the Hanna Parties that the covenant defaults by Hanna's Candle resulted in the Hanna Parties' cross-defaults under the October 2001 and 2005 JB Hanna loans, as well as the various JB Hanna and Kerzen swap agreements.

In November 2010, the Bank filed this action against the Hanna Parties, alleging breach of contract by JB Hanna and Kerzen, and breach of guaranty by Mr. Hanna and Hanna's Candle. The district court's jurisdiction was premised on diversity of citizenship. 28 U.S.C. § 1332. The Bank requested that the court adjudge JB Hanna and Kerzen liable for the principal and interest amounts due under the loan

and swap agreements, as well as costs, expenses, and fees incurred by the Bank. The Bank also sought an order that the rents from JB Hanna's and Kerzen's real property be used to satisfy partially the debts owed, that JB Hanna and Kerzen turn over to the Bank all collateral that the borrowers used to secure the loans, and that Mr. Hanna and Hanna's Candle, as guarantors, pay any outstanding obligations under the loan and swap agreements.

The Hanna Parties filed an answer, pleading several affirmative defenses, namely that the Bank (1) waived the Hanna Parties' breach, (2) failed to mitigate its damages, (3) committed a prior breach of contract, excusing the Hanna Parties' performance, and (4) breached the duty of good faith and fair dealing. The Hanna Parties also counterclaimed, alleging fraud, breach of fiduciary duty, deceptive trade practices, negligence, breach of contract, rescission, and reformation.

The Hanna Parties demanded a trial by jury. The Bank filed a motion to strike the Hanna Parties' jury demand, based on the jury-trial waivers in the swaps and other documents. The district court, however, denied the Bank's motion because the 2005 JB Hanna loan did not contain a jury-trial waiver. The court found the absence of the waiver in the 2005 loan "notable because . . . JB Hanna's alleged default on this particular loan triggered defaults on [the Hanna Parties'] other obligations via cross-default provisions."

The Bank filed two motions for summary judgment, arguing that the Hanna Parties' counterclaims were barred by the statute of limitations, and, in any event, that the Bank was entitled to judgment as a matter of law on all claims and counterclaims. The district court granted summary judgment for the Bank as to the Hanna Parties' counterclaims, but denied the Bank's motion as to its affirmative claims for relief. According to the district court, although "[i]t is undisputed that the parties entered into a series of enforceable contracts and that JB [Hanna] and Kerzen failed to perform required acts under those contracts when JB [Hanna] did not pay the 2005 loan

balance at maturity and Kerzen breached the financial performance covenants," the Hanna Parties produced sufficient evidence on their affirmative defenses to survive summary judgment.

Before trial, JB Hanna sold its Fayetteville manufacturing facility, which had been used as collateral for the October 2001 and 2005 JB Hanna loans. JB Hanna paid the Bank 100 percent of the net proceeds from the sale ($8,751,272.29), to be applied against the Hanna Parties' indebtedness to the Bank. According to the Bank, then, the Hanna Parties owe the Bank: (a) $7,801,168.30 under the 2005 JB Hanna loan; (b) $981,861.87 under the October 2001 JB Hanna loan; (c) $1,880,106.08 under the 2006 Kerzen loan; (d) $1,234,659.42 for costs associated with the 2005 JB Hanna swap; (e) $93,668.61 for costs associated with the 2007 JB Hanna swap; (f) $234,998.71 for costs associated with the 2006 Kerzen swap; and (g) the costs incurred by the Bank in pursuing its rights and remedies under the contracts, less the $8,751,272.29 received from JB Hanna's sale of its Fayetteville facility.

The trial began on June 18, 2012. At trial Mr. Hanna acknowledged that JB Hanna failed to pay the balance due under the 2005 JB Hanna loan when it matured on September 20, 2010. A representative of Hanna's Candle acknowledged that in 2007 and 2010, Hanna's Candle's tangible net worth fell below the level mandated by the 2006 Kerzen loan. The Hanna Parties emphasized, however, that their contractual breaches, if any, were excusable because the maturity dates of the 2005 JB Hanna loan and the 2005 JB Hanna swap should have matched, and they did not realize the dates were different when they signed the documents.

After the close of the evidence, the district court concluded as a matter of law that the 2005 JB Hanna loan and 2005 JB Hanna swap were separate and distinct agreements. The court also determined that the contracts were unambiguous with respect to their maturity dates. The Bank requested a jury instruction setting forth those conclusions and their legal effect, but the court denied the request. The court

explained that the jury could infer those conclusions from the absence of any jury instructions on the Hanna Parties' defenses of fraud and breach of fiduciary duty; the court refused to give those instructions after determining that the Bank "had no fiduciary duty to any of the Hanna entities." The district court also refused to prohibit the Hanna Parties from mentioning any parol evidence in their closing argument, stating that the Bank could rebut any such references by the Hanna Parties in its own closing argument.

On June 26, 2012, the jury returned nine general verdict interrogatories, finding that the Hanna Parties did not breach the 2005 JB Hanna loan, the swap agreements, or any of the other contracts. On June 29, the district court entered judgment in favor of the Hanna Parties. The Bank filed a Rule 50 motion for judgment as a matter of law and a Rule 59 motion for a new trial. The district court denied both motions. On August 28, 2012, the court awarded the Hanna Parties $415,058.63 in attorneys' fees, and denied the Bank's motion for an award of its fees.

The Bank appeals, arguing that the district court erred in denying the Bank's motion to strike the Hanna Parties' jury-trial demand, and that the jury's verdict must therefore be vacated. The Bank also contends that the district court erred in refusing to grant the Bank judgment as a matter of law or, alternatively, a new trial based on the weight of the evidence. In addition, the Bank asserts that a new trial is warranted because the district court erroneously permitted the jury to consider parol evidence and improperly instructed the jury. The Hanna Parties cross-appeal, arguing that the district court erred by granting summary judgment in favor of the Bank as to their counterclaims.

## II.

The Bank first argues that the Hanna Parties waived their Seventh Amendment right to a jury trial, and that the judgment entered pursuant to the jury's verdict should

be vacated. We conclude, however, that the district court properly denied the Bank's motion to strike the Hanna Parties' jury-trial demand, because JB Hanna did not waive its jury-trial right with respect to the 2005 JB Hanna loan.

The Seventh Amendment preserves "[i]n Suits at common law, . . . the right of trial by jury." U.S. Const. amend. VII. Although the jury-trial right can be waived, *Ind. Lumbermens Mut. Ins. Co. v. Timberland Pallet & Lumber Co.*, 195 F.3d 368, 374 (8th Cir. 1999), the right "is fundamental," so we "indulge every reasonable presumption against [its] waiver." *Id.* (quotations omitted); *see also Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937).

All of the agreements at issue here contained jury-trial waivers, except the October 2001 and 2005 JB Hanna loan agreements. The Bank urges us to read the jury-trial waivers in the other agreements as extending to JB Hanna's October 2001 and 2005 loans. Indulging reasonable presumptions against waiver, however, we decline to impute the jury-trial waivers in JB Hanna's swap agreements to JB Hanna's 2005 loan. Even though JB Hanna's 2005 swap agreement, which incorporated by reference the jury-waiver provision of the 1998 Master Agreement, was used to fix artificially the interest rate on the 2005 JB Hanna loan, the swap and loan agreements were separate and distinct transactions. The jury-trial waivers applicable to JB Hanna's swaps, moreover, do not by their own terms extend to the JB Hanna loans. In the 1998 ISDA Master Agreement, JB Hanna waived its jury-trial right "with respect to any legal proceeding arising out of or relating to [the Master] Agreement or any Transaction contemplated hereby." The context of the agreement shows that a "Transaction" means swaps entered into pursuant to the Master Agreement, not associated loans.

The Bank similarly contends that the jury-trial waivers in the 2001 and 2005 Hanna guaranties should be read to encompass the associated October 2001 and 2005 JB Hanna loans, emphasizing that Mr. Hanna signed all four agreements. But "[a]

waiver by one party cannot bind other parties. The right to a jury trial runs to every party. Each party has the right to demand a jury." 9 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2321 (3d ed.) (footnote omitted); *see also Christenson v. Diversified Builders Inc.*, 331 F.2d 992, 994 (10th Cir. 1964). The Bank argues that Mr. Hanna signed the guaranties and the JB Hanna loan agreements, and that *Midland Property Partners, LLC v. Watkins*, 416 S.W.3d 805 (Mo. Ct. App. 2013), is persuasive authority that a party's jury-trial waiver in a guaranty results in the party's waiver as to a related loan. But unlike the guarantor in *Midland*, *see id*. at 813, Mr. Hanna signed the instruments in different capacities. He signed the 2001 and 2005 Hanna guaranties in his personal capacity, but executed the October 2001 and 2005 JB Hanna loan agreements on behalf of JB Hanna as manager of the company. The jury-waiver provisions of the guaranties state that the guarantor (Mr. Hanna) waives his jury-trial rights, but do not mention the borrower on the underlying loan (JB Hanna) at all. *See Shapiro v. Marstone Distribs.*, 337 N.Y.S.2d 928, 930 (N.Y. App. Div. 1972). For these reasons, we conclude that Mr. Hanna's waiver of his jury-trial right with respect to the 2001 and 2005 Hanna guaranties does not demonstrate that JB Hanna waived its separate jury-trial right with respect to the October 2001 and 2005 JB Hanna loans.

The Bank also argues that the district court at least "should have made findings and conclusions with regard to the loans and swaps that <u>did</u> have jury waivers," because the lack of jury-waiver provisions in the October 2001 and 2005 JB Hanna loan agreements "hardly justifies nullifying those provisions in the remaining seven agreements." But determining whether JB Hanna's default under the 2005 JB Hanna loan triggered cross-defaults under the parties' other agreements hinges at least in part upon the interpretation and application of the cross-default provision in the 2005 loan agreement, as to which JB Hanna did not waive its jury-trial right. We therefore see no error in the district court's resolution of the jury-trial waiver issue.

-11-

## III.

The Bank next argues that the district court erred in denying its post-verdict motion under Rule 50(b). Rule 50(b) provides: "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), . . . the movant may file a *renewed* motion for judgment as a matter of law." Fed. R. Civ. P. 50(b) (emphasis added).

"Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." Advisory Committee Note on 2006 Amendment to subdivision (b) of Rule 50. Thus, a party who fails to file a preverdict motion for judgment as a matter of law cannot "question the sufficiency of the evidence either before the district court through a motion for judgment notwithstanding the verdict or on appeal." *Smith v. Ferrel*, 852 F.2d 1074, 1075 (8th Cir. 1988); *see also Mathieu v. Gopher News Co.*, 273 F.3d 769, 777 (8th Cir. 2001). Rule 50(b) was amended in 2006 to permit renewal of *any* Rule 50(a) motion for judgment as a matter of law—deleting the requirement that the motion be made at the close of all the evidence—but the requirement of a preverdict motion under Rule 50(a) remains. *See* Advisory Committee Note on 2006 Amendment to subdivision (b) of Rule 50. Rule 50(b) "states in simple language that a renewed motion for judgment as a matter of law must be preceded by a motion for judgment as a matter of law." *Catlett v. Local 7370 of United Paper Workers Int'l Union*, 69 F.3d 254, 258-59 (8th Cir. 1995). The Bank failed to file a preverdict motion pursuant to Rule 50(a), so the district court properly denied the Bank's Rule 50(b) motion.

The Bank urges us to excuse noncompliance with Rule 50 because the "purposes" of the rule were satisfied by other notice-giving actions of the Bank, but we are not convinced. "Strict adherence to the rule comports with its underlying policy of preventing questions concerning compliance with the Seventh Amendment." *Mathieu*, 273 F.3d at 777.

In *Catlett*, we acknowledged a limited exception to the requirements of the previous version of Rule 50(b) where "there has been substantial, if not literal, compliance with the rule." 69 F.3d at 259 n.6. This court has permitted an appeal based on sufficiency of the evidence where the movant filed an imprecise Rule 50(a) motion but fleshed out the motion in summary judgment memoranda or a colloquy with the district court. *See Walsh v. Nat'l Computer Sys., Inc.*, 332 F.3d 1150, 1158-59 (8th Cir. 2003). The Bank, however, filed no preverdict motion for judgment as a matter of law, and we decline to extend the concept of substantial compliance to accommodate the Bank's shortcomings here.

The Bank further contends that we have acknowledged an exception to Rule 50's strictures where "manifest injustice will otherwise occur since the verdict is totally without legal support." *Catlett*, 69 F.3d at 259 n.6. In *United States v. Harrell*, 133 F.2d 504 (8th Cir. 1943), this court stated that "a federal appellate court, in order to prevent a manifest miscarriage of justice, may notice an apparent error not properly raised" due to a failure to comply with Rule 50. *Id.* at 507; *see also Pulla v. Amoco Oil Co.*, 72 F.3d 648, 655 (8th Cir. 1995). *Harrell* emphasized, however, that the power may be "invoked only in the exceptional case" and "is infrequently exercised, and more often in criminal, rather than in civil, cases." 133 F.2d at 507. Assuming such authority still exists in an "exceptional case," moreover, the proper remedy is a new trial, not a directed verdict in the Bank's favor. *See Johnson v. New York, N.H. & H. R. Co.*, 344 U.S. 48, 54 (1952); *Karjala v. Johns-Manville Prods. Corp.*, 523 F.2d 155, 157 n.2 (8th Cir. 1975). The Bank separately appealed the denial of its motion for a new trial, so there is no need to consider that question under the rubric of an exception to Rule 50.

IV.

The Bank argues alternatively that the district court abused its discretion in denying the Bank's Rule 59 motion for a new trial because the verdict was against the

great weight of the evidence. The Hanna Parties incorrectly assert that the motion is foreclosed by the Bank's failure to move for judgment as a matter of law under Rule 50(a). A litigant may seek a new trial under Rule 59 based on the great weight of the evidence without having moved previously for judgment as a matter of law. *Johnson*, 344 U.S. at 54; *Pulla*, 72 F.3d at 656. The text of Rule 59 does not require a preverdict motion. *See Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*, 602 F.3d 541, 546 (3d Cir. 2010). A party must pursue a post-verdict motion under Rule 59 in order to pursue a new trial on appeal, *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404 (2006), but the Bank satisfied that requirement.

"[T]he granting or denial of a new trial is a matter of procedure governed by federal law." *Brown v. Royalty*, 535 F.2d 1024, 1027 (8th Cir. 1976); *accord Pitts v. Electro-Static Finishing, Inc.*, 607 F.2d 799, 802-03 (8th Cir. 1979). We review the district court's denial for clear abuse of discretion. *Parton v. White*, 203 F.3d 552, 556 (8th Cir. 2000). A new trial is warranted when the outcome is against the great weight of the evidence so as to constitute a miscarriage of justice. *Bair v. Callahan*, 664 F.3d 1225, 1230 (8th Cir. 2012).

We conclude that the district court committed a clear abuse of discretion by denying the Bank's motion for a new trial, because the verdict was against the great weight of the evidence. Indeed, the district court itself, at the conclusion of the evidence, remarked that "had [it] known that the facts were going to be as they ultimately came out at trial, [it] would have granted summary judgment on the plaintiff's case." Tr. 1121-22.

In this diversity action, whether the jury's verdict was against the great weight of the evidence is judged in accordance with substantive state law. *See Pitts*, 607 F.2d at 803; *Brown*, 535 F.2d at 1027. We apply the substantive law, including the choice-of-law rules, of the forum State. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Winter v. Novartis Pharm. Corp.*, 739 F.3d 405, 410 (8th Cir. 2014). The

parties agree that the October 2001 and 2005 JB Hanna loans and the 2006 Kerzen loan are governed by Arkansas law, and they do not question that Arkansas law governs the vast majority of this dispute. The Bank argues that New York law governs the swap contracts, due to choice-of-law provisions in the ISDA Master Agreements, and the Hanna Parties do not dispute that point on appeal. In any event, we see no material conflict between Arkansas and New York law in the context of this dispute.

To establish its breach-of-contract claim, the Bank was required to prove by a preponderance of the evidence that: (1) there were valid and enforceable contracts; (2) the Hanna Parties breached their obligations thereunder; and (3) the Bank suffered damages as a result. *Ultracuts Ltd. v. Wal-Mart Stores, Inc.*, 33 S.W.3d 128, 133 (Ark. 2000); *see also Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (applying New York law). The jury's conclusion that the Hanna Parties did not breach is against the great weight of the evidence. The parties entered into enforceable contracts. The Bank satisfied its commitments thereunder. JB Hanna and Kerzen failed to fulfill their obligations under those contracts when JB Hanna did not pay the 2005 loan balance at its maturity in September 2010 and when Kerzen breached the financial-condition covenants. The Bank was financially harmed thereby.

The district court correctly determined that the 2005 JB Hanna loan and 2005 JB Hanna swap are separate and distinct agreements, and that differences in maturities between the two agreements do not create an ambiguity. The Hanna Parties admitted as much in their Second Amended Counterclaim, where they pleaded that the 2005 JB Hanna swap was "independent" of the 2005 JB Hanna loan. *See Mo. Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1314 (8th Cir. 1990). Even absent the Hanna Parties' admission, the record makes clear that the 2005 JB Hanna swap and the 2005 JB Hanna loan are separate and distinct agreements. The agreements were not executed contemporaneously. The Hanna Parties made separate payments on the two

-15-

obligations. *See BKB Props., LLC v. SunTrust Bank*, 453 F. App'x 582, 586-87 (6th Cir. 2011). The two agreements are governed by different choice-of-law provisions. *See PC Scale, Inc. v. Roll Off Servs., Inc.*, 379 S.W.3d 649, 653 (Ark. Ct. App. 2010). Although the two instruments embody related transactions, there is a paucity of proof that they constitute a single agreement with an ambiguous maturity date.

By the plain terms of the 2005 JB Hanna loan, JB Hanna breached its obligations to the Bank under that agreement. The 2005 JB Hanna loan, on its face, mandated that when the loan matured on September 20, 2010, "[JB Hanna] shall pay all principal remaining outstanding on the Loan on the Maturity Date," and the "[f]ailure of [JB Hanna] to pay any principal of any of the Obligations or interest accrued thereon when due" constituted an "Event of Default." The Hanna Parties do not dispute that JB Hanna failed to pay the 2005 JB Hanna loan in full in September 2010. Although the Hanna Parties made a "monthly payment" to the Bank, the loan balance was due and payable *in full*, and the Hanna Parties' partial payments did not cure their default or satisfy their outstanding obligations. *See Zufari v. Architecture Plus*, 914 S.W.2d 756, 761 (Ark. 1996) (citing Restatement (Second) of Contracts § 235(2) (1981)). In fact, in notifying the Hanna Parties of their breach, the Bank expressly informed the Hanna Parties that "partial payments shall not constitute, or be deemed to be, a cure of the Default or waive, limit, or condition any of Bank's rights and remedies." The Hanna Parties rely on parol evidence to dispute the alleged breach, but the Bank preserved its objection to that evidence through motions *in limine* upon which the district court definitively ruled, *see* Fed. R. Evid. 103(b), and parol evidence should not have been admitted for the purpose of varying or contradicting the written contract. *Knight v. Interco Inc.*, 873 F.2d 1125, 1127 (8th Cir. 1989) (applying Arkansas law).

The Hanna Parties' breach of the 2005 JB Hanna loan resulted in the default and cross-default of all of the other agreements. That the Hanna Parties paid $8.75 million in May 2012—well after the due date—did not eliminate the breach of

contract that arose from the failure to make timely payments on the JB Hanna loans and the associated agreements that were accelerated because of the defaults.

The Hanna Parties argue that there was ample evidence to support a jury finding of no breach of contract based on their affirmative defenses. As relevant here, the jury was instructed on three affirmative defenses: that the Bank (1) waived the breach by Hanna's Candle by accepting monthly payments on the 2006 Kerzen loan; (2) committed a prior breach of the contracts, excusing the Hanna Parties' non-performance; and (3) breached the covenant of good faith and fair dealing. Any conclusion by the jury that the Hanna Parties established these defenses to the Bank's claims was against the great weight of the evidence.

Under Arkansas law, waiver is "the voluntary abandonment or surrender by a capable person of a right known by him to exist, with the intent that he shall forever be deprived of its benefits." *Bharodia v. Pledger*, 11 S.W.3d 540, 545 (Ark. 2000). Here, the Hanna Parties did not show persuasively that the Bank knowingly and intentionally waived any rights it had under the 2006 Kerzen loan. Rather, the evidence shows that the Bank repeatedly notified Kerzen that Hanna's Candle had breached the financial-condition covenants in the Kerzen loan, continuously refused to "waive, limit or condition any of the Bank's rights and remedies" against the Hanna Parties, and "expressly reserved" all such rights and remedies. The 2006 Kerzen loan, moreover, explicitly provided that any waiver must be in writing. The Hanna Parties presented no other evidence showing that the Bank intended to waive its rights and remedies against the Hanna Parties for their default of the 2006 Kerzen loan.

Likewise, if the jury concluded that the Bank—prior to any breach by the Hanna Parties—materially breached one of the contracts, thereby excusing the Hanna Parties' non-performance, that conclusion was contrary to the great weight of the evidence. The Hanna Parties appear to argue that the Bank committed a prior breach (1) by declaring all of the Hanna Parties' obligations due when they had not defaulted

-17-

under the 2005 JB Hanna loan (which they allege matured in 2015, not 2010), and (2) by failing to terminate the swaps in accordance with the terms of the swap contracts.

As the district court concluded, the 2005 JB Hanna loan and the 2005 JB Hanna swap were unambiguous and were separate and independent contracts, so there could be no confusion about the maturity dates of the contracts. The district court rightly rejected the Hanna Parties' assertion that the Bank committed a prior breach by declaring the Hanna Parties in default of the 2005 loan upon its stated maturity in 2010. Under the plain terms of the agreements, the Hanna Parties breached, so the Bank justifiably declared them in default of the 2005 loan and in cross-default of the other contracts.

The Hanna Parties' alternate contention that the Bank did not follow the terms of the swap contracts is also unavailing. The Hanna Parties argue that the Bank failed to provide timely notice of an early termination date under the 1998 ISDA Master Agreement. They contend that the Bank gave notices of a default in October 2010, BOA App. 326-330, but did not declare early termination dates within twenty days of the notice, as allegedly required by the master agreement. BOA App. 400, 573, 579. Assuming there was a procedural breach by the Bank, however, the breach did not occur prior to the default by the Hanna Parties. Nor was it sufficiently serious to discharge entirely the obligations of the Hanna Parties. "A relatively minor failure of performance on the part of one party does not justify the other in seeking to escape any responsibility under the terms of the . . . contract." *Dongary Holstein Leasing, Inc. v. Covington*, 732 S.W.2d 465, 467-68 (Ark. 1987) (citing *Henslee v. Mobley*, 230 S.W. 17 (Ark. 1921)), *overruled on other grounds by Quinn Cos. v. Herring-Marathon Grp., Inc.*, 773 S.W.2d 94 (Ark. 1989); *see TXO Prod. Corp. v. Page Farms, Inc.*, 698 S.W.2d 791, 793 (Ark. 1985). Especially where the verdict was general, and there is no way to know which of several defense theories the jury accepted, the evidence in support of this affirmative defense was not strong enough to defeat the Bank's new-trial motion. *See Wilmington Star Mining Co. v. Fulton*, 205

U.S. 60, 78-79 (1907); *Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 29-31 (1st Cir. 2004).

Finally, the Hanna Parties' defense based on an alleged breach of the implied covenant of good faith and fair dealing is unsupported by the weight of the evidence. "[A]n implied covenant should not be used to limit an expressly bargained-for term." *Gunn v. Farmers Ins. Exch.*, 372 S.W.3d 346, 352 (Ark. 2010). Our statement in *Taylor Equip., Inc. v. John Deere Co.*, 98 F.3d 1028 (8th Cir. 1996), is consistent with Arkansas law: "The covenant is a method to fill gaps in a contract" and "has nothing to do with the enforcement of terms actually negotiated," so it "cannot block use of terms that actually appear in the contract." *Id*. at 1032 (internal quotations omitted); *see Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728, 732-33 (8th Cir. 2003) (applying Arkansas law) (citing *Taylor Equip., Inc.*, 98 F.3d at 1032-33). Here, the loans expressly required the Hanna Parties to make certain payments on specified dates and did not confer any discretion on the parties in the performance of their duties.

In sum, the jury's conclusion that the Hanna Parties did not breach their contracts with the Bank—whether predicated on the jury's determination that the Bank failed to establish breach or that the Hanna Parties proved one or more of their defenses—is against the great weight of the evidence. We therefore reverse and remand for a new trial. We need not address the Bank's alternative contentions that the district court erred in giving certain jury instructions. *See Taylor v. Dormire*, 690 F.3d 898, 901 n.1 (8th Cir. 2012); *Qualley v. Clo-Tex Int'l, Inc.*, 212 F.3d 1123, 1132 n.18 (8th Cir. 2000).

V.

On cross-appeal, the Hanna Parties argue that the district court erred in granting summary judgment for the Bank as to the Hanna Parties' fraud, breach of fiduciary

-19-

duty, deceptive trade practices, negligence, breach of contract, and reformation counterclaims. We review *de novo* a district court's grant of summary judgment. Summary judgment is appropriate when there is no genuine dispute between the parties as to any issue of material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Arkansas law governs most of the claims; the Bank contends that New York law applies to one of the Hanna Parties' fraud claims. We see no material conflict between Arkansas law and New York law, so we will refer to them interchangeably.

The district court properly granted summary judgment for the Bank on the Hanna Parties' fraud, breach of fiduciary duty, negligence, and deceptive trade practices counterclaims, because the statute of limitations bars those claims. The Hanna Parties base these four counterclaims on the Bank's allegedly fraudulent failure to match the maturity dates of the 2005 JB Hanna loan and swap, or to explain the risks of mismatch. The limitations period for fraud, breach of fiduciary duty, and negligence suits is three years, *see* Ark. Code § 16-56-105; *Rice v. Ragsdale*, 292 S.W.3d 856, 860 (Ark. Ct. App. 2009), and the limitations period for claims on written contracts and for actions based on the Arkansas Deceptive Trade Practices Act is five years. *See* Ark. Code § 16-56-111; *id.* § 4-88-115.[2]

---

[2]New York law provides that "[a]n action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply." N.Y. Civ. Prac. L. & R. § 202. The Hanna Parties' fraud claim accrued in Arkansas, *see IKB Int'l S.A. v. Bank of Am.*, No. 12 Civ. 4036, 2014 WL 1377801, at *5 (S.D.N.Y. Mar. 31, 2014), and none of the Hanna Parties is a New York resident, so by virtue of New York's borrowing statute, the Arkansas statute of limitations would apply under New York law.

Absent concealment, the statute of limitations begins to run upon the occurrence of the wrong. *Delanno, Inc. v. Peace*, 237 S.W.3d 81, 84 (Ark. 2006). Although "fraud suspends the running of the statute of limitations," the suspension remains in effect only "until the party having the cause of action discovers the fraud or should have discovered it by the exercise of reasonable diligence." *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011) (quotations omitted) (applying Arkansas law); *see also Koch v. Christie's Int'l PLC*, 699 F.3d 141, 155-56 (2d Cir. 2012).

The Hanna Parties possessed the 2005 JB Hanna loan and swap contracts, which set forth their maturity dates, by September 2005. At that point, the alleged fraud reasonably could have been discovered, *Delanno*, 237 S.W.3d at 84-85; *Wilson v. Gen. Elec. Capital Auto Lease, Inc.*, 841 S.W.2d 619, 620 (Ark. 1992), for "one is bound to know the content of a document one signs." *Banks v. Evans*, 64 S.W.3d 746, 751 (Ark. 2002). The Hanna Parties did not file their first counterclaim until December 2010.

The Hanna Parties assert a separate theory of fraud that was not alleged in their pleadings: that the Bank committed fraud by representing falsely that refinancing was a better deal. Assuming that this claim was tried by consent, *see* Fed. R. Civ. P. 15(b), the limitations period was not suspended long enough to make the claim timely. *Delanno*, 237 S.W.3d at 84-85; *Wilson*, 841 S.W.2d at 620. On appeal, the Hanna Parties argue that they "could not possibly have known about the Bank's fraudulent actions—and its violations of Bank policies to conceal their actions—without the benefit of extensive discovery." But the newly alleged fraud—namely, the Bank's purported misrepresentation that a new $11.2 million swap would be a better deal for the Hanna Parties—could have been discovered by the Hanna Parties through the exercise of reasonable diligence. *See Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 259-60 (S.D.N.Y. 1999); *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 66 (N.Y. App. Div. 2012). The Bank's alleged profit motive and failure

to follow internal company procedures had no bearing on the ability of the sophisticated Hanna Parties to investigate the details of the transactions.

In entering into the 2005 JB Hanna swap, JB Hanna specifically agreed that (1) it was "not relying on any communication (written or oral) of the [Bank] as investment advice or as a recommendation to enter into that Transaction," (2) it was "capable of evaluating and understanding (on its own behalf or through independent professional advice), and underst[ood] and accept[ed], the terms, conditions and risks of that Transaction," and (3) the Bank was "not acting as [its] agent, fiduciary or advisor." By September 2005, the Hanna Parties possessed information regarding the prior proposal, as well as the 2005 loan and swap contracts. At any point after September 2005, the Hanna Parties could have used that information to determine for themselves which proposal was in their best interest. *See Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 450 F. App'x 32, 34 (2d Cir. 2011); *Alexander v. Flake*, 910 S.W.2d 190, 194 (Ark. 1995). The Hanna Parties did not file their counterclaim until more than five years after September 2005, so the fraud claim is time-barred. Whether the Hanna Parties should have been permitted to raise the substance of these counterclaims as an affirmative defense of setoff against damages owed to the Bank is not before us, because the district court entered judgment in favor of the Hanna Parties.

The Hanna Parties challenge the district court's grant of summary judgment on their counterclaim that the Bank breached its contractual obligations to them under the 2005 JB Hanna loan. It is undisputed that the Hanna Parties failed to pay the balance of the 2005 JB Hanna loan due upon its maturity in September 2010, so it was proper for the Bank to declare the Hanna Parties in default of the 2005 JB Hanna loan. The Hanna Parties counter that there are material issues of disputed fact regarding whether the 2005 JB Hanna loan matured in 2010 or 2015, and whether the Bank improperly declared default and cross-default, accelerated the indebtedness of the swap agreement, and applied the default rates of interest under those agreements beginning

in October 2010. But there was no ambiguity in the maturity date of the 2005 JB Hanna loan agreement, and the Bank's declaration of cross-default under the various agreements was permissible under the plain terms of the contracts. We agree with the district court that "it is improper to bootstrap a breach of contract counterclaim that relies on an underlying fraud counterclaim that is untimely." The Hanna Parties have failed to identify any term of any of the agreements that the Bank breached. The district court properly granted summary judgment in favor of the Bank on the Hanna Parties' breach-of-contract counterclaim.

The Hanna Parties also seek to revive their equitable counterclaim for reformation. The Hanna Parties argued in the district court that "whether through intentional misrepresentation, mistake or negligence," the Bank "sold [JB] Hanna a Swap bearing a term five years longer than the maturity of the note[]," so "there was no meeting of the minds between the parties," "no agreement was ever formed," and either the 2005 JB Hanna note or 2005 JB Hanna swap "should be reformed" so that the two agreements "match [each] other." Under Arkansas law, "[r]eformation can be ordered only upon clear, convincing, and decisive evidence that a mutual mistake has been made in the drawing of an instrument, or that there has been a unilateral mistake accompanied by inequitable conduct on the part of the other party." *Bonner v. Sikes*, 727 S.W.2d 144, 145 (Ark. Ct. App. 1987); *accord Morton v. Park View Apartments*, 868 S.W.2d 448, 451 (Ark. 1993).

Whatever the Hanna Parties may have believed, there is insufficient evidence to show that the Bank was mistaken as to the terms of either the 2005 loan or swap, or that there was "a meeting of minds—an agreement actually entered into" prior to the writings. *Arnett v. Lillard*, 436 S.W.2d 106, 110 (Ark. 1969). Nor was there inequitable conduct on the part of the Bank, because the different maturity dates were plainly disclosed to the Hanna Parties through the written contracts. *McDermott v. United States*, 760 F.2d 879, 882 (8th Cir. 1985) (applying Arkansas law). Summary

judgment was thus appropriate for the Bank on the Hanna Parties' reformation counterclaim.[3]

\*     \*     \*

For the foregoing reasons, we vacate the judgment of the district court and remand for a new trial on the Bank's breach of contract claim. We also vacate the district court's order awarding attorneys' fees to the Hanna Parties. The district court's grant of summary judgment on the counterclaims of the Hanna Parties is affirmed.

—————————————————

[3]The Hanna Parties also purport to cross-appeal the district court's refusal to instruct the jury as to their affirmative defenses of fraudulent inducement and fraudulent failure to disclose, which they pleaded in response to the Bank's breach-of-contract claim. But the district court entered judgment for the Hanna Parties on the Bank's breach-of-contract claim, and a cross-appeal "may only be filed when a party seeks to enlarge its own rights under the judgment or to lessen the rights of its adversary under the judgment." *Aventis Pharma S.A. v. Hospira, Inc.*, 637 F.3d 1341, 1343 (Fed. Cir. 2011) (internal quotation omitted).