# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-2088

_____

Bank of America, N.A.,

*Plaintiff - Appellee,*

v.

JB Hanna, LLC; Kerzen Properties, LLC; Burt Hanna; Hanna's Candle Company,

*Defendants - Appellants.*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: April 5, 2017
Filed: August 9, 2017

_____

Before COLLOTON, BEAM, and BENTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Bank of America, N.A. sued Burt Hanna, JB Hanna, LLC, Kerzen Properties, LLC, and Hanna's Candle Company (collectively, "the Hanna Parties") for breach of contract after the Hanna Parties failed to pay a loan. A jury found that the Hanna Parties did not breach the contract, and the court entered judgment for them. On appeal, however, we reversed and vacated the judgment, after determining that the

jury's verdict was against the great weight of the evidence. *Bank of Am., N.A. v. JB Hanna, LLC*, 766 F.3d 841, 851-54 (8th Cir. 2014). On remand, the Hanna Parties advanced defenses of fraudulent inducement and fraudulent failure to disclose. The district court[1] granted the Bank's motion for summary judgment on those defenses, and the Hanna Parties appeal. Because JB Hanna could not have reasonably relied on the Bank's allegedly fraudulent representations, we affirm.

I.

The underlying facts of this case are set forth at length in this court's prior decision. We therefore address only the facts and procedural history that are relevant to this appeal.

In the late 1990s, JB Hanna began borrowing money from the Bank through floating-interest-rate loans. The Bank loaned millions to JB Hanna and entered into corresponding interest rate swap agreements with JB Hanna to fix the interest rate on the respective loans. An interest rate swap allows a borrower to hedge his exposure to changes in the interest rate on a floating-rate loan.

In the simplest case, the borrower makes fixed-rate interest payments to a counterparty, who makes floating-rate interest payments to the borrower. Both payment streams are based on a notional principal amount that often decreases during the term of the swap and matches the declining balance of a corresponding loan. By paying a fixed interest rate to a counterparty in exchange for the counterparty making payments based on the floating rate, a borrower can artificially "fix" the interest rate he pays on any associated loan. The swap agreements between the Bank and JB

_____

[1]The Honorable Brian S. Miller, Chief Judge, United States District Court for the Eastern District of Arkansas.

Hanna were governed by an International Swap Dealers Association ("ISDA") Master Agreement.

In 2005, JB Hanna sought to borrow $4 million from the Bank. JB Hanna, however, still owed the Bank approximately $7.2 million on previous loans, so the parties considered refinancing JB Hanna's existing debt in conjunction with the new $4 million loan to execute one $11.2 million loan agreement. Under this arrangement, JB Hanna and the Bank would also execute a new $4 million swap, and the two pre-existing swap agreements for the $7.2 million loan would remain in effect. JB Hanna's expert testified that this arrangement—having three separate swaps that terminate at different times—would have exposed JB Hanna to a floating interest rate before the $11.2 million loan matured.

On June 29, 2005, the Bank's loan officer reviewed the terms of the arrangement with JB Hanna. The loan officer noted that the Bank was proposing a five-year $11.2 million loan. He also informed JB Hanna that it "might want to fix the rate on the whole deal"—meaning execute one swap agreement for the entire loan—and that JB Hanna should let him know if it would like to pursue this option. Later, in an e-mail summarizing a telephone call between the loan officer and JB Hanna's controller, the loan officer outlined the terms of the new proposed swap arrangement. Under this proposal, the Bank would unwind the two existing swaps and execute one new swap on a notional principal amount of $11.2 million. Thus, the parties would execute one new $11.2 million loan and one new $11.2 million swap.

That same day, June 29, JB Hanna agreed to these terms and entered into an interest rate swap on a notional principal amount of $11.2 million to terminate on August 1, 2015. On September 20, 2005, JB Hanna and the Bank entered into a floating-rate loan of $11.2 million with a stated maturity date of September 20, 2010. Under this arrangement, the 2005 loan agreement matured in 2010, five years before the 2005 swap agreement would terminate.

In September 2010, the 2005 loan matured, JB Hanna failed to pay the balloon amount due, and the Bank declared JB Hanna in default. Pursuant to cross-default provisions in the Hanna Parties' other loan agreements, the Bank accelerated all other outstanding obligations owed. In November, the Bank sued the Hanna Parties, alleging breach of contract and breach of guaranty. In their answer, the Hanna Parties raised several affirmative defenses, including a fraud defense. The Hanna Parties also made counterclaims.

After the district court granted the Bank's motion for summary judgment as to the Hanna Parties' counterclaims, the case proceeded to trial. The Hanna Parties requested jury instructions on the defenses of fraudulent inducement and fraudulent failure to disclose. The district court denied this request, concluding that there was insufficient evidence of fraud. The court also noted that "had [it] known that the facts were going to be as they ultimately came out at trial, [it] would have granted summary judgment on the plaintiff's case."

The jury found that the Hanna Parties did not breach any agreement with the Bank, and the district court entered judgment in favor of the Hanna Parties. The Bank appealed, and the Hanna Parties cross-appealed.

This court vacated the judgment and remanded for a new trial. After concluding that the Bank failed to preserve its argument for judgment as a matter of law, we determined that the jury's verdict was against the great weight of the evidence. We therefore vacated the judgment and remanded for a new trial on the Bank's breach-of-contract claim.

On remand, the Bank moved for summary judgment on all claims against the Hanna Parties and affirmative defenses raised by the Hanna Parties. The district court eventually granted the Bank's motion for summary judgment. The court concluded that the fraud defenses failed because the Hanna Parties could not establish that JB

Hanna reasonably relied on the Bank's alleged misrepresentations. Citing this court's decision in the first appeal, the district court determined that the Hanna Parties were comprised of sophisticated business people, that the Hanna Parties possessed information about the 2005 loan and swap agreements by September 2005, and that this information was sufficient to enable the Hanna Parties to decide whether the loan and swap agreements were in their best interest. Because the court concluded that the Hanna Parties' setoff defense was identical to their fraud defenses, it also granted summary judgment for the Bank on the setoff defense.

The Hanna Parties appeal, and we review the district court's decision *de novo*, viewing the evidence in the light most favorable to the Hanna Parties. *Noreen v. PharMerica Corp.*, 833 F.3d 988, 992 (8th Cir. 2016). Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Hanna Parties bear the burden of proof on their fraud defenses; thus, they must present evidence sufficient to create a genuine dispute of material fact to survive the Bank's properly supported summary judgment motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The parties assert that New York and Arkansas law apply in this action, and they do not identify any meaningful difference between the two sources, so we may apply either. *See JB Hanna*, 766 F.3d at 852.

II.

The Hanna Parties raise two fraud-based defenses stemming from JB Hanna's 2005 loan and swap agreements with the Bank: fraudulent inducement and fraudulent failure to disclose. The Hanna Parties assert that the mismatched terms in the ten-year swap agreement and five-year loan agreement harmed JB Hanna by exposing it to additional risk and by causing it to pay more interest overall. They accuse the Bank of representing that the 2005 swap and loan agreement would be a better deal for JB Hanna and allege that this representation was false.

Both defenses require the Hanna Parties to show that JB Hanna's reliance on the Bank's allegedly fraudulent representation was reasonable. *See Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 239 (2d Cir. 1999) (applying New York law); *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995) (applying New York law). The parties agree that to determine reasonable reliance, New York courts consider three factors: "the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision." *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004) (applying New York law).

When examining whether a party reasonably relied on another's representation, sophisticated parties are held to a higher standard. *Id.*; *see U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 443-44 (S.D.N.Y. 2010) (applying New York law). JB Hanna is a sophisticated party. *See JB Hanna*, 766 F.3d at 856. Before JB Hanna entered into the 2005 loan and swap agreements, the company had experience with this type of agreement based on previous transactions with the Bank. During the discussions for the 2005 loan and swap agreements, JB Hanna was represented by sophisticated business people, including a chief financial officer, a controller, and legal counsel. JB Hanna also employed professionals, such as tax advisors and accountants, to assist it in operating its business.

We also must examine the relationship between the parties. The Hanna Parties characterize the Bank as a "longtime trusted advisor" and suggest that it was reasonable for JB Hanna to rely on the Bank's representations about the 2005 loan and swap agreements. The record belies this characterization. In the ISDA Master Agreement, which governed the 2005 swap agreement, JB Hanna agreed that it was "not relying on any communication (written or oral) of the [Bank] as investment advice or as a recommendation to enter into [the swap agreement]." JB Hanna acknowledged that it was "capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the

-6-

terms, conditions and risks of [the swap agreement]." A general non-reliance disclaimer like this one may be insufficient by itself to preclude reasonable reliance as a matter of law. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Citigroup Glob. Mkts. Inc.*, 987 N.Y.S.2d 299, 304 (N.Y. App. Div. 2014). But the undisputed facts of this case—including JB Hanna's prior experience with swap agreements, its sophisticated representation, and the terms of the ISDA Master Agreement—show that the Bank was not a fiduciary of JB Hanna and that JB Hanna was capable of determining for itself whether it should enter into a particular transaction. Nothing in the record suggests that the 2005 loan and swap agreements consisted of anything other than typical arms-length transactions between a creditor and debtor. *See Banque Arabe*, 57 F.3d at 158; *see also Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 122 (2d Cir. 1984) (applying New York law).

Next, we consider what information was available to JB Hanna at the time of the operative decision. The Hanna Parties argue that the relevant date is June 29, 2005. That is when the Bank allegedly made false representations about the 2005 swap and loan agreement and when JB Hanna entered into the ten-year swap agreement. But at the same time, the Hanna Parties admit that the ultimate alleged fraud and source of the harm was the mismatching of dates in the swap and loan agreements. The mismatched terms in the ten-year swap agreement and five-year loan agreement did not arise until September 20, 2005, when JB Hanna agreed to the five-year, $11.2 million loan agreement. Until that date, JB Hanna was free to negotiate the terms of the loan agreement to match the terms of the ten-year swap agreement.

All relevant information was available to JB Hanna by September 20, 2005, because JB Hanna knew that it had entered into a ten-year swap agreement and a five-year loan agreement. *See JB Hanna*, 766 F.3d at 856. The Hanna Parties argue that Burt Hanna, the manager of JB Hanna, believed that the Bank was guaranteeing a ten-year loan. This asserted belief is directly contradicted by the plain terms of the 2005

loan agreement. As a sophisticated party engaging in an arms-length transaction with a lender, JB Hanna cannot complain that it was induced to enter into a five-year loan when the terms were clear from the face of the 2005 loan agreement. *See Republic Nat'l Bank v. Hales*, 75 F. Supp. 2d 300, 313-15 (S.D.N.Y. 1999) (applying New York law); *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 600 (N.Y. 1959). The 2005 swap agreement was also clear that it terminated in August 2015. Thus, JB Hanna was on notice of the mismatch on September 20, 2005, when it signed the loan agreement. With the relevant information in hand, JB Hanna was capable of determining for itself whether it should enter into the five-year loan agreement in light of the ten-year swap agreement that it had signed just a few months earlier.

The Hanna Parties also contend that JB Hanna could not have been aware of the actual cost of the 2005 loan and swap agreements, because it lacked the expertise to evaluate the swap transaction. They assert that calculating the effective interest of the original proposed deal, which involved three separate swaps, was complex. Even if the calculation was complex, the Bank's purported misrepresentation that the 2005 swap and loan agreement would be a "better deal" for the Hanna Parties "could have been discovered by the Hanna Parties through the exercise of reasonable diligence." *JB Hanna*, 766 F.3d at 856. It was not reasonable for the sophisticated Hanna Parties to rely on the Bank's "better deal" representation without further inquiries into whether the 2005 swap and loan proposal was indeed better. In any event, JB Hanna did not accept the original proposal; it chose instead to enter into one swap agreement, and the interest rate for the swap was evident from the face of the agreement.

The Hanna Parties further point to the Bank's profit motive and alleges that JB Hanna could not have known that the Bank stood to profit more from the 2005 swap agreement than from the original proposed deal. But the Bank's alleged motive to profit from the 2005 agreement does not tend to show fraud; the potential benefit to

the Bank had no bearing on JB Hanna's ability to investigate the details of the transactions. *JB Hanna*, 766 F.3d at 856.

Viewing the evidence in the light most favorable to the Hanna Parties, we conclude that there is no genuine issue of material fact for trial, because the Hanna Parties have failed to present evidence that JB Hanna reasonably relied on the Bank's representations. The district court correctly rejected the defenses of fraudulent inducement and fraudulent failure to disclose as a matter of law. Because there is insufficient evidence to support the fraud defenses, the setoff defense also fails.

\* \* \*

The judgment of the district court is affirmed.

_____